LOWER NUECES RIVER WATER SUPPLY DISTRICT et al., Appellant,

v.

Holman CARTWRIGHT et al., Appellees.

No. 12783.

Court of Civil Appeals of Texas.

San Antonio.

Dec. 1, 1954.

Rehearing Denied Jan. 12, 1955.

:200

Potter & Cooper, Allen Wood, Ralph Wood, Fischer, Wood, Burney & Nesbitt, Corpus Christi, John S. Sellingsloh, James L. Shepherd, Jr., Baker, Botts, Andrews & Shepherd, Houston, Dumas, Huguenim & Boothman, Dallas, Farrell D. Smith, Corpus Christi; for appellants.

Beasley & Beasley, Dougherty & Dougherty, Beeville, R. E. Schneider, Jr., George West, Harry J. Schulz, Three Rivers, Fred H. Woodward, Corpus Christi, Vinson, Elkins, Weems & Searls, Victor W. Bouldin, Houston, Geo. F. Manning, San Antonio, L. Hamilton Lowe, Austin, Dobbins & Howard, San Antonio, for appellees.

NORVELL, Justice.

The court below declared the Act of the Legislature creating Lower Nueces River Water Supply District null and ineffective for the stated reason, "that the boundaries of the * * * District do not close and do not encompass a complete body of land and said District is not, therefore, legally created and does not legally exist."

The correctness of this holding is the principal question raised upon this appeal. Numerous other matters are raised and discussed in the brief, many of which in our opinion fall outside the power of appellees to justiciably raise and, considering the parties to this suit, beyond the authority of the Court to properly adjudicate.

Plaintiffs below were Holman Cartwright and twelve others who own land which will be inundated if the proposed Wesley Seale

dam and reservoir are constructed by the Lower Nueces River Water Supply District. They, as property owners, seek to prevent the taking of their lands by the district under the power of eminent domain. The defendants named were Lower Nueces River Water Supply District, hereinafter-referred to as the "District", and the five individuals making up its Board of Directors.

A number of additional parties intervened, among them being A. P. McMurtry, who does not allege that he owns property which the District may take or destroy in building the proposed dam, but says that he is a taxpayer and water user within the District and the City of Corpus Christi. He simply adopts the allegations of the plaintiffs' petition. In our opinion, this intervention neither enlarges nor restricts the scope of the litigation. The same is likewise true of the intervention of Dolph Briscoe and some seventeen others who describe themselves as owners of land within the watershed of the Nueces River and within the boundaries of Nueces River Conservation and Reclamation District, hereinafter sometimes referred to as the "Reclamation District", a political subdivision of the State created by the Legislature in 1935, Acts 44th Legislature, First Called Session, p. 1660, Article 8280–115, Vernon's Ann.Tex.Stats. These interveners assert that they are interested in the subject matter of the suit and for the most part adopt the allegations of plaintiffs' petition.

The holders of some of the negotiable bonds issued by the Lower Nueces River Water Supply District, namely, Merchants and Farmers Bank of Weatherford, Texas, and William H. Patton of Dallas, Texas, also intervened and asserted that such District was and is a validly created municipal organization.

In addition to the question of the validity of the District, two additional questions of substance are raised, namely, Does the District possess the power and authority to condemn lands lying without and beyond its boundaries, and, if such power be recognized as a general proposition, does the District possess the power to condemn lands lying within the Nueces River Conservation and Reclamation District? While the parties below evinced some willingness to litigate the validity and extent of the rights of the City of Corpus Christi in and to the waters of the Nueces River, we do not construe this suit as one to determine the validity, priority or extent of such water rights. The City of Corpus Christi is not a party to this suit, nor does any party plaintiff or intervener allege a threatened abridgment of or encroachment upon any specifically described right held by him in and to the waters of the Nueces. Some further detailed discussion of this point is deemed appropriate, but essentially this suit involves the authority of the District to condemn land under the power of eminent domain.

Obviously, if the District has no legal existence, it has no authority to take plaintiffs' land. We therefore examine the trial court's findings that the boundaries of the District do not close. Appellant Lower Nueces River Water Supply District includes within its limits the greater part of the City of Corpus Christi and was created by an Act of the 51st Legislature, Acts 1949, ch. 159, p. 326, Article 8280–134, Vernon's Ann.Tex.Stats., which sets out the following boundaries:

"Beginning on the southwesterly shoreline of Corpus Christi Bay at its intersection with the centerline of Alameda Drive extended;

"Thence, Southwest and northwest along the centerline of Alameda Drive to its intersection with the centerline of Sunshine-Airline Road;

"Thence, Southerly along the centerline of Sunshine-Airline Road to its intersection with the centerline of Lexington Boulevard;

"Thence, In a northwesterly direction along the centerline of Lexington Boulevard crossing the centerline of Highway 286 Chapman Ranch Road and continuing along the centerline of Lexington Boulevard *and along an extension of said Lexington Boulevard*

*in a northwesterly direction to an intersection with the centerline of Highway 9 at the centerline of County Road No. 41, said extension of Lexington Boulevard being shown on 'Nueces County Highway Map prepared by the Nueces County Engineering Department and dated Revised June, 1947'.*

"Thence, In a northwesterly direction along the centerline of Highway 9 to an intersection with the west line of W. W. Walton Tract and the east line of Antoine Ocker Tract, being on the west line of Range 6, Section 8 and the east line of Range 5, Section 8, of the Kinney Sections;

"Thence, North along the line forming the west line of Range 6, Section 8 and the east line of Range 5, Section 8, of the Kinney Sections, and crossing Tule Lake to a point on the south bank of Nueces River;

"Thence, In an easterly direction along the south bank of the Nueces River to the west shoreline of Nueces Bay;

"Thence, In a generally southerly and easterly direction along the westerly and southerly shoreline of Nueces Bay to its junction with the northerly and westerly shoreline of Corpus Christi Bay near U. S. Highway 181;

"Thence, In a generally southerly direction along the southerly and westerly shoreline of Corpus Christi Bay to the point of beginning;

"Also;

"All those certain tracts and parcels of land situated in Nueces County, Texas, described in Volume 293, page 333 of the Deed Records of Nueces County, Texas, and being described as follows, to wit:

"Second Tract:

"All of Fractional Section 148, lying west of the St. Louis, Brownsville & Mexico Railroad Company's right-of-way, of the F. Z. Bishop Subdivision of the Weil Ranch, containing 283.46 acres, according to the map of said subdivision of record in the Map Records of Nueces County, Texas.

"Third Tract:

"All of Fractional Section 147, lying west of the St. Louis, Brownsville & Mexico Railroad Company's right-of-way, of the F. Z. Bishop Subdivision of the Weil Ranch, containing 14.08 acres, according to the map of said subdivision of record in the Map Records of Nueces County, Texas, aggregating in both tracts 297.54 acres of land."

That portion of the description set forth in italics is primarily stressed as being inadequate to direct the location of a boundary. There is some contention that the first call is also defective. Alameda Drive does not extend to the Bay. An extension of the Drive, however, intersects the Bay shoreline some 200 or 300 feet from its terminus where it runs into Ocean Drive at right angles. The extension of Alameda Drive and the Drive itself, for a short distance from the shoreline, runs in a southwesterly direction. The Drive then turns and runs in a northwesterly direction. The only defect in the description, insofar as the first call is concerned, is that it reads, "Thence, Southwest and northwest along the center line of Alameda Drive", instead of "Thence southwest and northwest along Alameda Drive as extended and along Alameda Drive." We think the notes are reasonably clear on the point. The beginning point being set at the intersection of Alameda Drive as extended and the shoreline, it would necessarily be implied that to proceed along Alameda Drive it would be necessary to first proceed along Alameda Drive as extended.

Likewise, we are of the opinion that County Road No. 41 in the italicized portion of the description above set out may be located upon the ground as a matter of law, despite a jury's finding apparently to the contrary. This finding seems to have been based upon the circumstance that the road in question was not officially designated as *County Road No. 41.* At least,

the jury's finding is sought to be supported upon this theory. While the map designated in the description above quoted was not specifically referred to in connection with the location of County Highway No. 41, it was nevertheless admissible in evidence upon the point. (Appellees concede that insofar as County Highway No. 41 is concerned, a question of latent, as distinguished from patent, ambiguity is involved.) The map shows State Highway No. 9. It also shows a public road entering the highway at right angles which is designated by the figure 41 placed within a box or square. The map by its legend indicates that figures within squares are used to designate County Roads. No other road is suggested which will fulfill the calls contained in the notes, so we may safely conclude that the County Highway No. 41 shown on the map was the road to which the Legislature intended to refer.

As heretofore indicated, the contention most vigorously urged and which was sustained by the trial court, was that the portion of the description relating to an extension of Lexington Boulevard, as shown by the 1947 Nueces County Highway Map, was so indefinite as to render the entire description void and inoperative.

It is undisputed that the map in question is a schematic plat prepared from data and information obtained from a number of sources. Printed upon the map are the words, "Nueces County Highway Map," followed by the statement, "Prepared by the Nueces County Engineering Department from State Wide Highway Planning Survey Maps and other Sources, December, 1941, * * * Revised, June, 1947." The scale indicated is one inch to the mile. Numerous well-known geographical landmarks are delineated on the map, such as Corpus Christi Bay, Laguna Madra, Mustang and Padre Islands, and the Gulf of Mexico. Lines depicting each five minutes of latitude and longitude in the area are likewise shown.

In the particular area involved, Lexington Boulevard is shown running in a general northwest-southeast direction and ending at a point where it runs into the Chapman Ranch Road (State Highway No. 286) at a right angle. Some five miles north of this point, judging from the scale, State Highway No. 9 is shown which also runs in a general northwest-southeast direction. The map shows a point where County Highway No. 41 runs into State Highway No. 9. The Texas-Mexican Railway Company's tracks are shown running between the north point (State Highway No. 9— County Highway No. 41) and the south point (Lexington Boulevard—Chapman Ranch Road). The position of the tracks appears to be slightly over a mile south of the north point referred to. A broken line made up of dashes in the general form of an S curve is shown on the map connecting the north and south points above described. Going north, the curve shown is to the right of the tangent represented by Lexington Boulevard. This right-hand curve ends at Texas-Mexican Railway tracks and is succeeded by a left-hand curve from the railroad tracks to the north (County Highway 41—State Highway 9) point.

The southernmost or right-hand curve appears to be in the nature of a spiral curve, in that it is flattened at both ends. The southern end of the curve closely proximates the tangent for about a mile, according to the scale. The northern end of the right-hand curve is likewise flattened into an approximate straight line for a distance of a quarter of a mile before its intersection with the railroad tracks, which is the point of beginning of the left-hand or northernmost curve.

Upon oral argument some contention was advanced that it was impossible to tell what the broken line represented, in that the legend shown upon the map did not indicate that a broken line was the symbol used for a proposed extension of an existing road. This contention is not made in the briefs, nor can it be successfully supported. One reading the statutory field notes with the map before him, must necessarily conclude that the broken line refers to the extension mentioned in the notes. There is no other possible legislative intention that can be

gleaned from the words, "said extension of Lexington Boulevard being shown on Nueces County Highway Map. * * *"

In describing the broken line upon the map and its situation with reference to other objects, we have used words connoting estimate and approximation. These approximations constitute the basis of appellees' contention that a territorial area is not included within the notes because the five-mile segment of boundary represented by the broken line on a small scale map is too indefinite for practical application.

We are not here concerned with a description of land contained in a contract or deed between private parties, but with an Act of the Legislature. Furthermore, the District involved was endowed by the Act purportedly creating it with the power and authority to issue and sell negotiable securities. This power has been exercised and, as a necessary part of the process, the validity of such securities or bonds has been passed upon by the Attorney General in accordance with the provisions of Section 5 of the Act creating the District and Article 7880–34, Vernon's Ann.Tex.Stats. The Attorney General has therefore held that the District was a validly created municipal organization. San Antonio Union Junior College District v. Daniel, 146 Tex. 241, 206 S.W. 2d 995; Harris County v. Hammond, Tex. Civ.App., 203 S.W.2d 445; 39 Tex.Jur. 235, Statutes, § 126.

In State ex rel. Averitt v. Wofford, 90 Tex. 514, 39 S.W. 921, 922, the Supreme Court recognized that the territorial limits of a municipal corporation "should be in some manner defined", but held that when a description of the territory sought to be incorporated was set out in the statute itself, the general rules applicable to the construction of statutes had application. The Court said:

"The description of the territory incorporated in the special act in question is not so clear as to put it beyond question. But, in construing an act of this character, the rule which governs the construction of statutes in general must be applied. It is the duty of the courts to ascertain, if possible, the intent of the legislature, and, when so ascertained, to give it effect."

The applicable rule is stated in 2 McQuillin, Municipal Corporations (3rd Ed.) 261, as follows:

"It is generally held that the description of corporate boundaries are not construed with the same strictness as boundaries in grants of contracts. If the description of the boundaries of a statute cannot be literally applied on account of inaccuracy, the statute must receive a reasonable construction in order to carry into effect the intent of the Legislature.

"In ascertaining the municipal boundaries, due weight should be given to the contemporaneous interpretation of the courts and other lawful authorities and by the population at large. Maps published by authority of law may be referred to as evidence."

In 37 Am.Jur. 633, Municipal Corporations, § 16, it is said that:

"For obvious reasons, the descriptions of municipal boundaries are not construed with the same strictness as are those outlining the boundaries in grants or contracts."

See also, Magnolia Petroleum Company v. Walker, 125 Tex. 430, 83 S.W. 929; State v. Pioneer Oil & Refining Company, Tex. Com.App., 292 S.W. 869.

The Legislature undoubtedly intended that the description employed by it should effectively enclose a territorial area—that the field notes should close, in other words. We think that they do close. Despite the approximations we have used in describing the five-mile segment of boundary, by reason of the smallness of the scale of the map referred to, it is obvious that as to the overwhelming proportion of the territory involved, there is no doubt of its inclusion within the statutory field notes. The question of whether or not certain tracts or parcels of land in the vicinity of the bound-

ary represented by the broken line lie within or outside the District involves at most a comparatively small number of acres. Perhaps some dispute or litigation may be encountered by the District in subjecting certain lands in this area to taxation, but the fact that a boundary may become the subject of litigation does not mean that there is no boundary. If this were true, the State of Texas itself might be declared non-existent as it has engaged in numerous boundary disputes with its neighboring states and the federal government. We are unwilling to hold that the boundaries of the District are wholly beyond possibility of ascertainment. In this proceeding the pertinent question at issue is whether or not the District has boundaries. 2 McQuillin, Municipal Corporations (3rd Ed.) 261. As suggested by the intervening bondholders, the question of "where those boundaries exist upon the ground is not relevant to the District's validity, but would be relevant only when the question was properly raised by a landowner to determine whether his land was within or without the District."

■ Appellants in their brief argue at length that the trial court erred in excluding certain evidence which they contend would make the location of the five-mile disputed segment certain and definite. The excluded evidence consists for the most part of detailed source materials from which the map referred to by the Legislature was prepared. While we are inclined to agree with appellants in their contention, McCormick and Ray, Texas Law of Evidence, § 748, we also believe it is possible to locate the disputed segment of the boundary line by reference to the map itself. Delineated boundary lines upon a plat having directions clearly marked can generally be located upon the ground when drawn to a known and uniform scale. The smallness in scale may indicate the employment of a more satisfactory method than that usually employed in locating an office survey, but ordinarily smallness of scale in itself constitutes no insurmountable obstacle. Segments of maps may be enlarged upon a uniform scale for the purpose of facilitating measurement of degrees of curvature, distances and other particulars. "That is certain which is susceptible of being made certain." 14 Tex.Jur. 990, Deeds, § 202. However, as to where the boundaries of the District are to be located in a suit between proper parties, we need not express an opinion. The District has boundaries and the court below erred in holding the contrary.

■ We are also of the opinion that the District is authorized by law to condemn lands for a dam and reservoir site even though such lands lie beyond the territorial limits of the District.

The Act of the Legislature creating the District, Acts 1949, 51st Leg., p. 326, ch. 159, Article 8280–134, Vernon's Ann.Tex. Stats., contains the following provisions relating to its rights, powers and duties:

"Sec. 2. The District shall have and exercise, and is hereby vested with all of the rights, powers, privileges and duties conferred and imposed by the General Laws of this State now in force or hereafter enacted, applicable to water control and improvement districts created under authority of Section 59, Article 16 of the Constitution, but to the extent that the provisions of any such General Laws may be in conflict or inconsistent with the provisions of this Act, the provisions of this Act shall prevail. All such General Laws are hereby incorporated by reference with the same effect as if incorporated in full in this Act. * *

"Sec. 5. * * * The District may issue bonds thus authorized for any and all purposes permitted to Water Control and Improvement Districts including, but without limitation of purposes not specified, the following; the acquisition by construction or otherwise of plants and improvements for storing, treating, purifying, protecting, transporting, transmitting, delivery, and disposition of through sale or otherwise of flood, storm flow, or underground water, for uses permitted by law. * * *

"Sec. 9. The District shall have authority to acquire all property real and personal which within the discretion of the board of directors is needed in accomplishing the objectives of the District and to facilitate the acquisition of property it shall have all of the powers of eminent domain available to water control and improvement districts under the general law. * * *"

The general laws of the State applicable to water control and improvement districts and referred to in Section 2 of the 1949 Acts above quoted, are designated as Articles 7880-1 to 7880-153, inclusive, of Vernon's Ann.Tex.Stats. The basic Act was passed by the 39th Legislature, Acts 1925, p. 86, ch. 25, and numerous amendments thereto have been adopted.

Among the purposes for which such districts may be organized is that specifically stated in Subdivision (a) of Section 59 of Article 16, Constitution of Texas, namely, "the control, storing, preservation and distribution of its [the State's] storm and flood waters, the waters of its rivers and streams, for irrigation, power and all other useful purposes, * * *." Article 7880-3. To these districts are delegated "such functions, powers, authority, rights and duties as may permit the accomplishments of the purposes for which such districts may be created, including the investigation, and in case a plan for improvements is adopted, then, the construction, maintenance, and operation of all necessary improvements, plants, works and facilities, the acquisition of water rights and all other properties, lands, tenements, easements, and all other rights helpful to the purpose of the organization of the district, subject only to the restrictions imposed by the Constitution of the State of Texas or that of the United States: * * *." Article 7880-7.

A water control and improvement district is further empowered "to construct all plants, works, and improvements necessary to the purpose for which it is organized and incident thereto. * * * [They] may construct all works and improvements nec-essary for the prevention of floods, the irrigation of land in such districts, for drainage of lands and construction of levees to protect same from overflow, to alter land elevations where correction is needed, and to supply water for municipal uses, domestic uses, power and commercial purposes, and all other beneficial uses or controls." Article 7880-48.

It is further provided that, "The directors, employees and engineers of a district shall have authority to go upon any lands for the purpose of making surveys for reservoirs, canals, rights of way, dams, or other contemplated improvements and to attend to any business of the district, whether such lands are situated in the district or outside of such district." Article 7880-49.

Articles 7880-125 and 7880-126 relate to the property of a water control and improvement district and its powers of eminent domain. Among other means, such districts are authorized to acquire under the power of eminent domain, "all lands, materials, borrow and waste grounds, easements, rights of way and everything deemed necessary, incident or helpful for the purpose of accomplishing any one or more of the objects authorized for water control and improvement districts, which shall be held to mean the accomplishment of said objects by any practicable mechanical means: * * *." A detailed procedure is likewise provided for the taking of lands "either within or without the District," under the power of eminent domain.

It is uncontroverted that the City of Corpus Christi possesses certain rights in and to the waters of the Nueces River although the extent of these rights is a matter of dispute. It is also conceded that the District, as assignee of the City, has secured a permit from the Board of Water Engineers to build the proposed Wesley Seale Dam to impound certain waters of the Nueces River, and that it is proposed to distribute such impounded water to various municipalities, individual organizations and individuals within the boundaries of the District. (The City, however, has

assigned only its right to construct a dam under a permit from the Board of Water Engineers, as distinguished from its rights in and to the waters of the river.)

■ The Supreme Court has held that districts created for special purposes, such as water control and improvement districts, water supply districts and the like, perform limited rather than general functions when compared to the older types of municipal organizations, such as cities. "The powers of such districts are measured by the terms of the statutes which authorized their creation, and they can exercise no authority that has not been clearly granted by the legislature." Tri-City Fresh Water Supply Dist. No. 2 of Harris County v. Mann, 135 Tex. 280, 142 S.W.2d 945, 948. It follows that in determining the corporate powers of such districts, it is necessary to examine in some detail the legislative act and the constitutional basis upon which it rests. Water control and improvement districts, reclamation districts and river authorities are creatures of statute, and, although, insofar as the general scope of governmental operations are concerned, they could be classified as "low down in the scale or grade of corporate existence," yet within their proper sphere of operation they may be powerful instrumentalities exercising broad and important governmental authority, as may be seen by an examination of the various legislative enactments collated as Articles 8280–101 to 8280–160, inclusive, of Vernon's Ann.Tex.Stats.

In the legislative enactment creating the District here involved we find no territorial limitation which would preclude the acquisition of lands and property without its boundaries for the purpose of erecting a dam and providing a reservoir site for the storage of water. The construction of dams and reservoirs is in accordance with the permissible purposes for which the district was created and it is stated explicitly in the Act itself, that the District in the accomplishment of its purposes may condemn lands "either within or without the District". San Jacinto River Conservation and Reclamation District v. Sellers,

143 Tex. 328, 184 S.W.2d 920; Ball v. Merriman, Tex.Civ.App., 245 S.W. 1012, reversed upon grounds not involved in this litigation, State ex rel. Merriman v. Ball, 116 Tex. 527, 296 S.W. 1085.

■ As heretofore indicated, it appears that all of the lands which the District seeks to condemn for a dam and reservoir site lie within the boundaries of the Nueces River Conservation and Reclamation District. A portion of such lands is also located within the boundaries of another municipal organization known as the Jim Wells-Duval Counties Conservation and Reclamation District. Acts 1949, 51st Leg., p. 737, ch. 398, Article 8280–138, Vernon's Ann.Tex.Stats. This circumstance, however, does not operate to bar appellants' rights to the property under the power of eminent domain. The Nueces River Conservation and Reclamation District was created by the 44th Legislature at its First Called Session, Acts 1935, p. 1660, ch. 427, Article 8280–115, Vernon's Ann.Tex.Stats., and invested with broad and comprehensive powers and duties relating to the conservation, development and distribution of the public waters of the entire watershed of the Nueces River and its tributaries (excepting the portion thereof which lies within Webb County). We need not set out the provisions of this Act in detail. Suffice it to say that it appears possible that a conflict of authority between said Reclamation District and the Lower Nueces River Water Supply District may arise in the future. But no conflict has yet arisen. So far as the present record indicates, the Reclamation District remains a "paper district." It has constructed no dams upon the river nor taken affirmative steps to control, conserve, or store the waters of the Nueces watershed. It is not a party to this suit and consequently is not asserting that any of its corporate powers, rights or duties are being usurped or abridged by the appellant District. The presumption is that in the event the Reclamation District should become operative, conflicts of authority and jurisdiction will be settled and composed by the districts involved. City of San Antonio v. Trease, Tex.Civ.App., 243 S.W.2d

187. Of course, if they are not; the courts will be open to determine such disputes, as, if and when they arise. An inspection of the Acts collated in Articles 8280–101, to 8280–160, inclusive, Vernon's Ann.Tex. Stats., discloses numerous possible conflicts of authority, but it should not be held in the absence of a definite statutory provision to that effect that the operations of one of these creatures of the Legislature should be halted because of a possible conflict with the functions of another, particularly when the latter district is conducting no physical operations and exists only as a bare legal entity. What we have said with reference to the Nueces River Conservation and Reclamation District is likewise applicable to the Jim Wells-Duval Counties Conservation and Reclamation District. The fact that the lands sought to be condemned lie in whole or in part within these two reclamation districts constitutes no legal impediment to the exercise of the power of eminent domain by the appellant district.

The remaining matter calling for discussion may be disposed of rather briefly, as the City of Corpus Christi is not a party to this suit. In 1927, the City of Corpus Christi secured a permit from the Board of Water Engineers to appropriate and impound 500,000 acre feet of water from the Nueces River. However, the city, although authorized to build a much larger dam and reservoir, actually constructed one which provided storage for only 60,000 acre feet of water. The dam was finally completed in 1934, and although numerous attempts were made, from time to time, to secure a more adequate water supply for the City of Corpus Christi, it appears that no further water storage facilities were constructed. Based primarily upon these circumstances, the jury found that the City had abandoned all its rights in and to the waters of the Nueces under its permit, save and except as to the 60,000 acre feet, which was the capacity of the reservoir constructed in 1934. From this premise it is asserted that the Lower Nueces River Supply District was not authorized to construct a reservoir of 300,000 acre feet

capacity, such as would be created by the construction of the proposed Wesley Seale Dam. This contention is apparently based upon the theory that there would be no available water to store in said reservoir. It was not shown that the City's permit or any portion thereof had been forfeited by statutory proceedings. Articles 7474 and 7519, Vernon's Ann.Tex.Stats.; Hidalgo County Water Control and Improvement District No. 1 v. Goodwin, Tex.Com.App., 25 S.W.2d 813; Fairbanks v. Hidalgo County Water Improvement District No. 2, Tex.Civ.App., 261 S.W. 542. An intentional voluntary relinquishment of a known legal right, 1 Tex.Jur. 4, similar to an abandonment recognized at common law, is a basis of the theory advanced by appellees, and Art. 7544, Vernon's Ann.Tex. Stats., is said to relate to this type or species of abandonment. We have grave doubts as to the sufficiency of the evidence to support the jury's finding of abandonment. Mere nonuser for the three-year period prescribed by Article 7544, without a wilful intention to abandon will not result in the loss of rights under a permit. This seems clear from the language of the statute which uses the words, "wilfully abandoned." Nor does it seem that the failure of the City to make immediate use of all the water specified in the 1927 permit would support the hypothesis of "wilful abandonment." A city may be reasonably expected to grow and develop over a period of years, and if it does so, its demands for water, as well as other necessaries, would naturally increase. However that may be, this is not a suit to determine respective water rights in and to the waters of the Nueces River. No one here alleges that he is entitled to a specific portion of the waters from the Nueces which the City of Corpus Christi is threatening to take from him. Such matters, as well as speculations as to whether or not the proposed Wesley Seale Dam and Reservoir may, if constructed, be legally filled with sufficient water of the Nueces, are rather remote from the pertinent inquiry in this suit, namely, may the Lower Nueces River Water Supply District acquire lands belonging to Mr. Holman Cartwright for a dam and reser-

voir site under the power of eminent domain? We have held that the District is a legally constituted municipal organization and consequently possesses such power of condemnation.

The judgment of the trial court will accordingly be reversed and judgment here rendered that appellees take nothing as against appellants Lower Nueces River Water Supply District and its governing officials.

. Reversed and rendered.

POPE, J., did not participate in the decision of this case.