LOWER COLORADO RIVER
AUTHORITY et al.,
Petitioners,

v.

TEXAS DEPARTMENT OF WATER
RESOURCES et al., Respondents.

No. C–1620.

Supreme Court of Texas.

Nov. 14, 1984.

Opinion on Motion for Rehearing
May 22, 1985.

L.C. Meyer, Small, Craig & Werkenthin, Fred B. Werkenthin, Lawrence S. Smith and David L. Guerra, George & George, Thomas W. George, Vinson & Elkins, Roger P. Nevola, Austin, for petitioners.

Jim Mattox, Atty. Gen., Timothy L. Brown and R. Lambeth Townsend, Asst. Attys. Gen., Frank R. Booth and Skip Newsom, Austin, for respondents.

KILGARLIN, Justice.

This appeal of an administrative order affecting water rights poses the question of what constitutes unappropriated water. The Texas Department of Water Resources, through its judicial division, the Texas Water Commission, issued a permit [1] to the Colorado River Municipal Water District allowing it to impound water from the Colorado River to form a lake and to use annually 113,000 acre-feet of water from the river. The Lower Colorado River Authority, Garwood Irrigation Company and Lakeside Irrigation Company contested the proceeding and appealed to the District Court of Travis County.[2] The trial court upheld the order.

Contestants appealed further to the Third Court of Appeals, which affirmed the judgment, one justice dissenting. 638 S.W.2d 557.[3] The court of appeals held that the Department could find "unappropriated water" even though the existing appropriation permits showed insufficient water to supply the application. The court reasoned that historically usage statistics showed that the recorded appropriations were not being fully used and were unlikely to be fully used.

■ We reverse the judgments of the courts below because those courts have misconstrued and misapplied Tex. Water Code Ann. § 11.134. We hold that the term "unappropriated water" means the amount of water remaining after taking into account all existing uncancelled permits and filings valued at their recorded levels.

The Water District applied for a permit to impound over 500,000 acre-feet of water from the Colorado River at the Stacy Dam site southeast of Ballinger, Texas. The Stacy Dam and Reservoir have been proposed for that site at various times over the last twenty-five years. The Texas Wa-

1. Authority for the Commission to act in the name of and for the Department is contained in Tex. Water Code Ann. § 5.016(b), and acts of the Commission are to be considered as acts of the Department.

2. The City of Austin, also a contestant in the Texas Water Commission hearing, likewise appealed the Commission decision to the district court, but after the adverse ruling there, did not seek further relief.

3. Lake Travis Improvement Association was also an appellant in the court of appeals and sought writ of error in this court, which we dismiss for want of jurisdiction because of the failure of its application to contain a statement of jurisdiction. Tex.R.Civ.P. 469(d).

ter Commission therefore had before it a wealth of hydrologic information from past studies. In addition, the Department staff had prepared special studies for this particular application.

■ Colorado River water belongs to the State. Tex. Water Code Ann. § 11.021(a); *In re Adjudication of the Water Rights of the Upper Guadalupe River Basin*, 642 S.W.2d 438, 444 (Tex.1982); *Motl v. Boyd*, 116 Tex. 82, 111, 286 S.W. 458, 468 (1926). The right to impound water had to be obtained by the Water District, through a Department permit. Tex. Water Code Ann. § 11.121. To acquire a permit, the Water District had to satisfy the statutory grounds of Tex. Water Code Ann. § 11.-134(b)(2) & (3):

Action on Application

\* \* \* \* \* \*

(b) The commission shall grant the application only if:

\* \* \* \* \* \*

(2) unappropriated water is available in the source of supply; and

(3) the proposed appropriation:

\* \* \* \* \* \*

(B) does not impair existing water rights or vested riparian rights; and

(C) is not detrimental to the public welfare.

The Colorado River waters are presently charged with four types of outstanding water rights. There are vested riparian rights, certified filings, permits to appropriate water, and certificates of adjudication. The Colorado is an inconstant stream. There is insufficient water to satisfy the existing rights during drought, but the water supply is capable of supplying additional users during times of abundant rain.

The Department developed a sophisticated computerized model of the seasonally varying inflow to the Colorado at various points along the river. One goal of the computer model was to allow the staff to obtain a reasonably accurate scientific estimate whether there was "unappropriated water" at points along the river, at least during some seasons or months.

The computer model assumed that all existing recorded water rights in the Colorado River basin would be exercised in the maximum amounts authorized, or to the extent of water available from the inflows. The staff study concluded that "very little water would be available for appropriation at the proposed reservoir site.... The estimated firm yield of the reservoir for these quantities of appropriable water is 3,120 acre-feet per year...." The study also concluded that the proposed reservoir would adversely affect two existing downstream lakes—Lake Travis and Lake Buchanan—by reducing the firm yield of each by approximately fifteen percent.

The Water District rebutted the staff conclusion by expert studies and testimony. The studies used the hydrologic data from the staff report but discounted the recorded filings in a number of ways. As to certified filings, the experts presented historical use data to demonstrate that the maximum amount claimed under the filings had never in fact been used, and that some claims necessarily had not been "perfected." As to riparian rights, many of the riparian claims were invalid because they were based on Spanish and Mexican land grants that did not include riparian rights. Finally, experts testified that demographic projections and historical use data indicated that the full amounts authorized under uncancelled permits would not be used. By subtracting the estimated amounts that would not be used from the recorded filings, the Water District's expert witnesses concluded there was sufficient water available for the proposed Stacy Reservoir. Similarly, they concluded that downstream rights would not be impaired if occasional flow-throughs were allowed.

The Commission made finding 15 that there was "unappropriated water" within the meaning of section 11.134(b)(2).

After recognizing downstream existing appropriations and claims below Stacy Dam, the Commission finds that there are unappropriated flows in the Colorado

River at the dam site sufficient to permit the impoundment of 554,340 acre-feet of water at elevations 1151.5 feet above mean sea level and the diversion and consumptive use of not to exceed 113,000 acre-feet of water per annum without impairing existing water rights, provided releases of water from the reservoir are made from time to time in such quantities as may be necessary to provide water to which all superior and senior water rights are entitled.

▪ The undisputed evidence in this record is that existing uncancelled permits and filings, valued at their recorded levels, leave an insufficient supply of "unappropriated water for Stacy Dam." Sections 11.-134(b)(2) & (3) are unambiguous in their statements that the Commission shall grant applications for new water rights only if there is available unappropriated water and the new appropriation does not impair existing water rights or vested riparian rights. Additionally, granting additional permits cannot be detrimental to public welfare. Basically, our decision is that the article prohibits "double permitting" or the stacking of appropriated waters on appropriated waters.

The Water District relies upon its construction of two water code provisions for its contention that unbeneficially used water may be counted as unappropriated waters. They are sections 11.025 and 11.-146(e), (f):

§ 11.025 Scope of Appropriative Right
A right to use state water under a permit or a certified filing is limited not only to the amount specifically appropriated but also to the amount which is being or can be beneficially used for the purposes specified in the appropriation, and all water not so used is considered not appropriated.

§ 11.146 Forfeitures and Cancellation of Permit for Inaction
(e) If a permit has been issued for the use of water, the water is not subject to a new appropriation until the permit has been cancelled in whole or part as provided by this section.

(f) Except as provided by Subchapter E of this chapter, none of the provisions of this code may be construed as intended to impair, cause, or authorize or may impair, cause, or authorize the forfeiture of any rights acquired by any declaration of appropriation or by any permit if the appropriator has begun or begins the work and development contemplated by his declaration of appropriation or permit within the time provided by the law under which the declaration of appropriation was made or the permit was granted and has prosecuted or continues to prosecute it with all reasonable diligence toward completion.

Based on this statutory language, the Water District concludes that water which cannot be beneficially used "is considered not appropriated" under section 11.025, and therefore must be "unappropriated water" within the meaning of section 11.134(b)(2). It distinguishes the prohibition against "double permitting" in section 11.146(e) as applying only to specific construction projects.

The Lower Colorado River Authority contends, on the other hand, that section 11.-146(e) prohibits granting of a new appropriation for unused water until water rights from the existing permit are cancelled in whole or in part. Yet, in the case at bar, there has been no claim that existing water rights have been cancelled.

▪ We hold that second grants that overlay uncancelled water permits are not authorized, and except as provided by Subchapter E of the Water Code, existing rights may not be impaired or forfeited until cancelled in whole or in part. We arrive at this conclusion based on the water code's legislative history, the court decisions construing these provisions, views of commentators about the law of appropriations and cancellations, and the administrative history of the water code or its predecessor statutes.

*Legislative History*

The court of appeals construed the term "unappropriated water" contrary to the

legislative history of these statutes. The term, as used in section 11.134(b)(2), is not expressly defined in the water code. Prior to 1913, Texas had no system of permits allowing the appropriation of state water. Rather, Texas used the "filing" system in which a person claiming a right to use the water recorded his claim in the county in which he made it.[4] The filing method provided no guarantee that the water claimed was actually available and left to the court system the resolution of competing priority claims. This was based on the established "first in time, first in right" rule. The system actually magnified Texas' water law problems. *In re Adjudication of the Water Rights of the Upper Guadalupe River Basin*, 642 S.W.2d 438, 440 (Tex. 1982).

The filing method caused insecurity for investors. Those who sought to build a dam had no reasonable way of knowing whether there would be water available when they completed their project, particularly if they contemplated a downstream construction. The instability and uncertainty discouraged development necessary to allow proper water use. The Irrigation Act of 1913[5] sought to correct such problems.

Section 11.134(b)(2) finds its source in section 19 of the 1913 Act[6] and its reenactment in section 24 of the 1917 Act.[7] Representative D.W. Glasscock, a principal

author of the 1913 Act, stated that the purpose of the 1913 Act was to prevent overappropriation of rivers and thus to insure the stability necessary to attract development capital.[8] An initial purpose of the permit system has been to insure as much as possible that the water granted in a permit would be available when the project was completed. Section 11.146(e), by providing that water granted under *any* permit is not again subject to a new permit to appropriate until the permit has been cancelled in whole or in part, is consistent with the overall legislative purpose.

The court of appeals limited the application of section 11.146(e) by concluding that it applies only when cancellation is sought on the narrow ground that a permit holder had failed timely to commence and pursue construction of specific works necessary to divert the water. Based on our review of the legislative history of section 11.146(e), we do not agree that this limitation, if it exists, is significant. We furthermore hold the legislature meant the prohibition of "double permitting" water in subsection (e) to be applied to define the term "unappropriated water."

It is true that subsection (e) is located in a section of the code in which the first three subsections deal exclusively with cancellation for failure to commence and pursue construction of specific works. But subsections (c), (d) and (f) contain referenc-

---

4. Texas adopted the filing system of appropriative water rights in the Irrigation Act of 1889, 1889 Tex.Gen. Laws, ch. 88, at 100, 9 H. Gammel, Laws of Texas 1128 (1898), later amended in the Irrigation Act of 1895, 1895 Tex.Gen. Laws, ch. 21, at 21, 10 H. Gammel, Laws of Texas 751 (1898).

5. Irrigation Act of 1913, ch. 171, 1913 Tex.Gen. Laws 358.

6. *Id.* § 19 at 364.

7. Irrigation Act of 1917, ch. 88, § 24, 1917 Tex. Gen. Laws 211, 217.

8. Representative Glasscock's recorded remarks include:

    Under our present statutes the appropriator who, in good faith, complies with all the re-

quirements thereof does not know whether he has obtained anything thereby, nor can he offer any assurance of that fact to those from whom he would obtain capital to develop his enterprise. Who will advance funds for costly improvements, dependent for their value solely upon a water supply that may exist today and tomorrow be numbered among the things that were? How many individuals and communities in this state ... have sought to interest capital and been met upon the threshold by the legitimate and unanswerable objection: "You have no adequate protection under the law to assure the water supply upon which your proposition depends"? When the provisions of this bill are complied with and a permit obtained, a reasonable assurance of title and of legal protection of the rights involved can be shown.

H.J. of TEX., 33rd Leg., Reg.Sess. 949, 954 (1913).

es to cancellation under other provisions of the code. The Water Code was the second codification by the Texas Legislative Council pursuant to a directive from the legislature "for formal revisions on a topical or code basis ... [of] the statutory law of Texas." In 1963, the legislature directed that "[i]n carrying out the revision program, the sense, meaning or effect of any legislative act shall not be altered." Tex. Rev.Civ.Stat.Ann. art. 5429b–1, § 1. The Foreword to the then proposed water code was written by the Executive Director of the Texas Legislative Council. The Foreword describes the codification as "a *non-substantive* revision of the general and permanent water law." I Vernon's Texas Water Code Annotated v (1972) (emphasis added). There is no indication that a change in meaning for subsection e was intended by its current placement in the Water Code. Thus, we look to the prior enactments and codifications for guidance.

The provisions appeared in the 1925 Revised Civil Statutes as part of article 7474 with the clear indication that water under permit was not subject to a new permit to appropriate.[9] The 1917 Act prohibited granting water to a new applicant if the water was covered by an existing permit, whether the permit was granted under the 1913 Act or the 1917 Act.[10] At the time the provision was enacted, the only purpose for obtaining a permit was to begin such a water-use project. Whether the work "contemplated" by the permit was digging a diversion ditch or erecting a dam, water granted under the permit was not subject to a new appropriation. The reference in the final clause, that water under a permit from the 1917 Act or from the prior 1913 Act "shall not be subject to new appropriation until the permit is cancelled by the Board [of Water Engineers] in whole, or in part, ..." represented the greatest possible restraint upon the grant of permits for water already subject to a permit to appropriate.

The Water District may take little comfort that this predecessor to section 11.-146(e) was included in a provision relating it to a "work" project. The Water District's position, accepted by the court of appeals, is that the last clause of section 11.025 of the present code controls over section 11.146(e). The predecessor to section 11.025, as codified in the 1925 Revised Civil Statutes and as it appeared in the 1917 Act, was also limited to "works." It provided that the use of water was limited to what would "be necessarily required when beneficially used ... *irrespective of the capacity of the ditch or other works,* and all the water not so applied shall not be considered as appropriated." Irrigation Act of 1917, ch. 88, § 45, 1917 Tex.Gen. Laws 211, 222 (emphasis added).

The legislature, in amending the statutory water laws, has explicitly shown its purpose to interdict "double permitting" of water, expressed in what are now subsections 11.146(e) and (f), applies broadly. That purpose was to prohibit a permit for water already covered under an existing permit or certified filing. The original 1913 Act and the 1917 Act provided only

---

**9.** Tex.Rev.Civ.Stat.Ann. art. 7474 (repealed 1972), read as follows, in relevant part:

[B]ut if any appropriator under this chapter, or other law of this state, has failed or fails to begin the work and development contemplated by his declaration of appropriation within the time provided in the law under which the same was or is made, or has failed or fails, to prosecute the same with all reasonable diligence toward completion, his right to so much water as has not been applied, or is not applied to beneficial use, as defined in this chapter, shall be considered as, and shall be, forfeited, and such water shall be subject to new appropriation under this chapter; provided, that no such rights shall be declared forfeited until the person or persons who are the owners of the land and whose rights are claimed to have been forfeited, shall first be given due notice and hearing, as required in Article 7519 of this chapter; and, provided further, that if a permit for the use of such water has been issued, or is issued, under this Act, or under the Act approved April the 9th, 1913, such water shall not be subject to new appropriation until the permit is cancelled by the Board in whole, or in part, in accordance with the provisions of Article 7519 of this chapter.

**10.** Irrigation Act of 1917, ch. 88, § 7, 1917 Tex. Gen. Laws 211, 212–13.

for cancellation of a permit for failure to begin the work on a project or for failure to develop the project diligently. There was no provision for cancellation of permits for nonuse, if they had originally been developed (other than cancellation for wilful abandonment, which required proof of actual intent to abandon).[11] In 1953, the legislature amended the existing water laws to allow cancellation of any permit for which no part of the water authorized to be withdrawn and appropriated had been put to use for a period of ten consecutive years next preceding the effective date of the act. Act of 1953, ch. 352, § 1, 1953 Tex.Gen. Laws 867. The act's emergency clause stated that the cancellation provisions were necessary to make available for new appropriation, waters which were already allocated in outstanding permits but which were not being put to beneficial use by existing permit holders. Act of 1953, ch. 352, § 5, 1953 Tex.Gen. Laws 867, 868. The act also directed the existing water agency, then the Board of Water Engineers, to examine its records to determine what permit holders had never reported actual use of any part of their permitted amount during the relevant period, and to give notice that under the act their rights were cancelled.

The court of appeals rationalized that the statement in *Motl v. Boyd,* 116 Tex. 82, 286 S.W. 458 (1926), that the Board of Water Engineers would merely consult their records to determine the amount of existing appropriations, was not contrary to its holding in this case. "Records," to the court of appeals, included the required annual reports which showed how much water the permittee actually used. The court of appeals reasoned that in consulting its records, to determine whether there existed

"unappropriated water," the Board would consider how much of the recorded appropriation was going unused. That rationalization is directly contrary to the legislature's purpose. According to the 1953 Act, even if the records under the existing permit indicated the appropriator had not used any water at all for the last 10 years, it was still necessary to cancel the unused permit before the water covered by it would again be subject to a new appropriation.[12]

Legislative awareness that "unappropriated water" for purposes of section 11.-134(b)(2) means water not covered by the face amount granted under existing outstanding permits and certified filings, has been demonstrated two additional times. In 1957 the legislature added provisions for the cancellation of a permit for which no part of the amount of water authorized had been put to beneficial use for ten years. It also provided for *partial* cancellation of any portion of water granted under a permit when the portion had not been used at any time during a ten-year period and for which the permittee's nonuse was not justified. Act of 1957, ch. 39, §§ 1, 2, 1953 Tex.Gen. Laws 82, 83–84. That act's emergency clause also stated it was necessary because "a public need exist[ed] to make such water available for appropriation and beneficial use...." Act of 1957, ch. 39, § 3, 1957 Tex.Gen. Laws 82, 85.

The legislature added the Water Rights Adjudication Act of 1967 to provide for Department of Water Resources recordation of then unrecorded water rights claims, to limit the exercise of such claims to actual use, and to provide for adjudicating these rights. Tex. Water Code Ann.

11. Tex. Water Code Ann. § 11.030; *State Board of Water Engineers v. Slaughter,* 382 S.W.2d 111 (Tex.Civ.App.—San Antonio 1964), *writ ref'd n.r.e. per curiam,* 407 S.W.2d 467 (Tex.1966); *Lower Nueces River Water Supply District v. Cartwright,* 274 S.W.2d 199 (Tex.Civ.App.—San Antonio 1954, writ ref'd n.r.e.).

12. Also, the original 1913 and 1917 acts had provided for the preliminary examination of applications and for the Board of Water Engineers summarily to reject an application and

return the application fee if there were no unappropriated water in the proposed source of supply. Irrigation Act of 1917, ch. 88, § 22, 1917 Tex.Gen. Laws 211, 217; Irrigation Act of 1913, ch. 171, § 17, 1913 Tex.Gen. Laws 358, 363. If the amounts of recorded appropriations could be reduced by a subjective "likely nonuse" factor based on reported actual use, it seems unlikely the legislature would have provided for summary rejection on this ground.

§§ 11.301, 11.302. The act required mandatory judicial review, after which the amounts were added to the Commission's recorded filings as "certificates of adjudication." Tex. Water Code Ann. § 11.303; *In re Adjudication of the Water Rights of the Upper Guadalupe River Basin*, 642 S.W.2d 438 (Tex.1982). The original 1967 act provided for recording these "certificates of adjudication," but failed to provide for cancellation if they fell into nonuse, as analogous provisions for permits or certified filings allowed for nonuse cancellation.

In 1975, the legislature corrected the omission by adding provisions that a certificate of adjudication could be cancelled in whole or in part for nonuse. Act of 1975, ch. 27, § 1, 1975 Tex.Gen. Laws 49. The emergency clause of that act again stated the provision was necessary because a public need existed to make the water available for appropriation and beneficial use. Act of 1975, ch. 27, § 3, 1975 Tex.Gen. Laws 49, 51.

In both the 1975 and 1957 acts, the legislature provided that the Water Commission, or its predecessor agency, should examine its records on actual use under existing permits or filings and initiate proceedings to cancel those permits or certificates of adjudication that had gone unused for ten years. If nonuse alone, without formal cancellation, made the water again available for a permit to appropriate, the directive would have been unnecessary. Construing nonuse alone to free the water for a new appropriation also contradicts the emergency clauses of both acts.

### Prior Court Decisions

The construction of "unappropriated water" approved by the court of appeals is also contrary to prior writings by this court. In *Motl v. Boyd*, 116 Tex. 82, 286 S.W. 458, 475 (1926), the court stated in reference to the construction of the predecessor to section 11.134(b)(2):

It is the duty of the board [of Water Engineers] to reject applications where there is no unappropriated water in the source of supply. The facts as to that question can be determined by the board by the mere matter of adding up the amount of water previously appropriated and shown on their records, and subtracting it from the amount of state water they had previously determined the stream furnished.

Similarly, in upholding the constitutionality of the 1957 cancellation provisions, this court wrote:

Once water is appropriated, its availability to another user is reduced or defeated, and if the permittee does not use a substantial portion of it the water will run unused into the sea.

*Texas Water Rights Commission v. Wright*, 464 S.W.2d 642, 647 (Tex.1971). We consider it implicit in these opinions that appropriated water is not subject to a new permit until the existing permit has been cancelled, forfeited or otherwise invalidated.

### Administrative History and Commentators' Views

The construction given "unappropriated water" by the Commission in this case and by the court of appeals is also contrary to evidence of agency practice in applying the state's water laws. A.P. Rollins, a member of the Board of Water Engineers, stated it was the Board's practice to value existing recorded permits at full face value to determine whether "unappropriated water" existed in order to grant a new application. Rollins, *The Need for a Water Inventory in Texas*, Proceedings of the 1952 & 1954 Water Law Conferences, University of Texas School of Law 67, 68 (1954); Rollins, *Policies of the Board of Water Engineers in Passing Upon Applications for Appropriative Rights*, Proceedings of the 1952 & 1954 Water Law Conferences, University of Texas School of Law 221, 222-3 (1954). The very first report of the Board of Water Engineers reflected the Board's understanding that under the 1913 Act water granted under a permit was not subject to a new appropriation until the existing permit had been cancelled in whole or in part. The report states:

Under the present status, a permit issued by the Board is essentially the concession of a perpetual monopoly. If the population should remain stationary, or human ingenuity should never be able to discover enlarged or more economic uses for water, there would be nothing objectionable in it. But since we do not know that what appears to be economic today will not be viciously wasteful tomorrow under these existing conditions, we believe it should be the policy of the State to grant these concessions for fixed periods only, renewable at the end of the stated periods under such reasonable regulations as experience and the common weal may suggest and demand, and as will not result in the confiscation of created wealth.

Booth, *Applications for Permits to Appropriate Water*, Proceedings of the Water Law Conference, University of Texas School of Law 96, 106 (1959), citing First Report of the Board of Water Engineers 39 (1914). The Commission that issued the present order itself indicated its approval of the use of the full recorded amounts in its new computerized model. Thirty-third Report of the Texas Water Rights Commission 14–15 (1977).

Commentators also state that the construction of "unappropriated water" should be that water granted under an uncancelled permit was not subject to a new permit. Bouldin, *The Law of Surface Water Rights in Texas*, Proceedings of the 1952 & 1954 Water Law Conferences, University of Texas School of Law 97, 102 (1954). Perhaps nowhere is there a clearer statement of what "unappropriated water" is, than in a panel discussion that ultimately led to the 1957 amendment allowing the partial cancellation of permits and certified filings for nonuse:

Since it is apparent on the face of many of those [old certified filings] that it was beyond fulfillment or hope of fulfillment as far as total use was concerned, it would seem reasonable and desirable that some limitation be fixed or a procedure established by which the unused portion can be returned to the public domain for appropriation to others who will put it to beneficial use.

Remarks of R. Richard Roberts, in *Panel Discussion on Legislative Problems in the Field of Riparian and Appropriative Rights*, Proceedings of the 1952 & 1954 Water Law Conferences, University of Texas School of Law 239, 240 (1954).

The language of section 11.025 suggests that its definition of "not appropriated water" does not apply to section 11.134(b)(2). Section 11.025 refers to the amount granted under a permit or certified filing as "the amount specifically *appropriated*" (emphasis added). It states that the amount of an appropriation that cannot be used beneficially "is considered not appropriated," not that it is "again subject to appropriation." In intending to make the water available to applicants for a new permit, the legislature, in section 11.030, expressly stated the water is "again subject to appropriation."[13]

■ The majority of the court of appeals reasoned, through a series of rhetorical questions, that the term, "unappropriated water," included unused waters that were subject to existing permits. The court reasoned that any other construction would mean the Commission and its predecessor agencies had shirked their statutory duty by allowing Texas rivers to become overappropriated. There can be no doubt that the prevention of overappropriation was a principal goal of the legislative scheme. Nineteenth Biennial Report of the Board of Water Engineers 8 (1948–50); Cox, *The*

---

**13.** The language "again subject to appropriation," or its equivalent, is not new to the 1972 codification. For example, the 1917 act provided that after notice and hearing the Board of Water Engineers might declare a permit for water forfeited for nondevelopment, "and such water shall be subject to new appropriation under this Act." Irrigation Act of 1917, ch. 88, § 7, 1917 Tex.Gen. Laws 211, 213. The 1913 Act provided that if a permit holder wilfully abandoned water use for three consecutive years, his rights to the water were forfeited and "the water formerly so used or appropriated shall be again subject to appropriation for the purposes stated in this Act." Irrigation Act of 1913, ch. 171, § 49, 1913 Tex.Gen. Laws 358, 370.

*Texas Board of Water Engineers,* 7 Texas L.Rev. 86, 96 (1928). The fact that some rivers are overappropriated does not mean the state's water agencies have failed in their duty. Because of changing circumstances, the vagaries of nature or the possibility of erroneous assumptions about the inflow amounts to the rivers, overappropriation may exist. These circumstances may make any river overappropriated, particularly during a drought period, and thus there can be no substitute for enforcement. The Texas statutes protect senior water rights from actual impairment. No matter how many permits the Commission issues, the action is purely administrative, and it cannot divest or impair prior rights.

### Conclusion

■ Under the law, the Department may not grant permits when its own records show that the supply must come from an existing downstream permittee's water that the Department speculates he will not actually need. Section 11.025 places a limit on the amount of water that can be used benefically or the amount the senior holders can claim, even though the face amount of their permits may be more. Among other things, that limitation serves to distribute the water appropriately when there is a drought. It does not mean the Department may intentionally overappropriate. A contrary decision would return water rights to the state of chaos that the act is designed to avoid. For example, upstream junior permit holders whose grants depended upon an overappropriation of the stream would suffer the most from deprivation of water in times of drought. The water source they had come to rely upon would be denied them.

■ The legislature also recognized the important principle of beneficial use. No person is granted the right to waste water by not using it. *In re Adjudication of the Water Rights of the Upper Guadalupe River Basin,* 642 S.W.2d 438 (Tex. 1982); *Texas Water Rights Commission v. Wright,* 464 S.W.2d 642 (Tex.1971). It is for that reason that unbeneficial use can be

corrected by cancellation. To order partial cancellation of a permit for nonuse, the Commission must find, among other facts, that the permittee was not *justified* in his nonuse or does not have a bona fide intention of putting the unused water to an authorized beneficial use within a reasonable time. Tex. Water Code Ann. § 11.-182(a)(3). The legislature directed the Commission to consider the financial investment made and the amount of time usually necessary for development in making its determination. Tex. Water Code Ann. § 11.182(b)(1), (4).

■ The Water District and the Department have a remedy expressly granted by the legislature. If there exist recorded permits, filings and certificates of adjudication that will not reasonably be used in the future, the Department or another interested party must seek total or partial cancellation of those rights. Only after sufficient cancellations have freed that water from its commitment, may the Department again grant a permit to appropriate it.

We reverse the judgments of the courts below and set aside the permit granted by the Texas Department of Water Resources to the Colorado River Municipal Water District.

RAY, J., files a concurring opinion.

RAY, Justice, concurring.

I agree with the court's conclusion that "unappropriated water" must not include water already granted under an existing, uncancelled permit. I do not agree with the court's disposition of setting aside the Commission's order. I would remand the case to the Commission for further proceedings in accordance with the opinion.

Under section 19(e)(4) of the Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19-(e)(4)(Supp.1984), the court has authority to remand the case to the administrative agency if the findings of the agency are affected by an error of law. *Railroad Commission of Texas v. Home Transportation Co. Inc.,* 654 S.W.2d 432, 434 (Tex.

1983). The Commission's error was applying the wrong definition of "unappropriated water." This court had not previously expressly addressed the question. Had the water district presented its application under the proper standard, it could have simultaneously sought partial or total cancellations of unused water rights under existing certified filings and permits. Although the district can now file a new application using the proper definition, that action would not be a complete remedy. Both the priority of an appropriation and the claimant's right to use the water date from the filing of the *application* with the Department. Tex. Water Code Ann. § 11.-141 (Supp.1984). Since the misconception of the law caused the Commission to commit error, I believe it is appropriate to preserve the district's priority by remanding to the Commission for proper proceedings under the correct legal standard. *Cf. Lewis v. Metropolitan Savings and Loan Ass'n*, 550 S.W.2d 11, 16 (Tex.1977); *Lewis v. Gonzales County Savings and Loan Ass'n*, 474 S.W.2d 453, 458–59 (Tex.1971).

## OPINION ON MOTION FOR REHEARING

KILGARLIN, Justice.

The motion for rehearing of Lake Travis Improvement Association is granted in part. Our opinion of January 9, 1985 is withdrawn and this opinion is substituted therefor.

We grant in part the motion for rehearing filed by the Colorado River Municipal Water District and withdraw our previous judgment of November 14, 1984. The application for a water permit was filed by the district on February 21, 1978, at which time the priority date of the permit attached. From that time, Colorado River Municipal Water District proceeded through the administrative and judicial channels to obtain the permit. Because an examination of authorities on the issue demonstrates that a remand is more appropriate than a reversal and rendition, we reverse the judgments of the courts below and remand the cause to the Texas Depart-

ment of Water Resources pursuant to our power under the Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat. Ann. art. 6252–13a, § 19(e)(4) (Vernon Supp.1984). *See also, e.g., Railroad Commission of Texas v. Home Transportation Co.*, 654 S.W.2d 432, 434 (Tex.1983); *Lewis v. Metropolitan S & L Ass'n*, 550 S.W.2d 11 (Tex.1977). The order dismissing the application of Lake Travis Improvement Association for want of jurisdiction is withdrawn and the application is granted and disposed of by the judgment in this cause. In all other respects, the motion by the district and the other motions for rehearing are overruled.