ACCEPTED
03-14-00416-CV
5197870
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/7/2015 3:28:51 PM
JEFFREY D. KYLE
CLERK

**Case No. 03-14-00416-CV**

**IN THE
THIRD COURT OF APPEALS
AT AUSTIN, TEXAS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/7/2015 3:28:51 PM
JEFFREY D. KYLE
Clerk

**BRADLEY B. WARE,**
*Appellant,*

**v.**

**TEXAS COMMISSION ON ENVIROMENTAL QUALITY,**
*Appellee.*

**ON APPEAL FROM THE 53RD JUDICIAL DISTRICT COURT OF TRAVIS COUNTY, TEXAS**

**APPELLANT'S REPLY BRIEF**

Stephen P. Webb
Bar No. 21033800
s.p.webb@webbwebblaw.com
Gwendolyn Hill Webb
Bar No. 21026300
g.hill.webb@webbwebblaw.com
Attorneys for Appellant
Webb & Webb, Attorneys at Law
211 East Seventh Street
Austin, Texas 78701
Phone: 512-472-9990

**APPELLANT REQUESTS ORAL ARGUMENT**

Case No. 03-14-00416-CV


**BRADLEY B. WARE,**
*Appellant,*

v.

**TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,**
*Appellee.*

---

**REQUEST FOR ORAL ARGUMENT**

---

Appellant, Bradley B. Ware, requests an oral argument in this case.

# TABLE OF CONTENTS

Request for Oral Argument.........................................................................................i

Index of Authorities ............................................................................................. iii

Appellant's Reply Brief .........................................................................................1

Additional Procedural History ..............................................................................1

Restatement and Update of Standard of Review ...................................................2

Introduction and Summary ....................................................................................7

Ware's Reply to Appellee TCEQ's Brief Pertaining to All of Ware's Points of
     Error ...........................................................................................................11

Ware's Reply to Appellee TCEQ's Brief Pertaining to Ware's Point of Error
     Number 1. ..................................................................................................19

Ware's Reply to Appellee TCEQ's Brief Pertaining to Ware's Point of Error
     Numbers 2 and 5 .......................................................................................21

Ware's Reply to Appellee TCEQ's Brief Pertaining to Ware's Point of Error
     Number 3. ..................................................................................................23

Ware's Reply to Appellee TCEQ's Brief Pertaining to Ware's Point of Error
     Number 4. ..................................................................................................24

Ware's Reply to Appellee TCEQ's Brief Pertaining to Ware's Point of Error
     Number 6. ..................................................................................................25

Conclusion ...........................................................................................................26

Prayer for Relief...................................................................................................29

Certificate of Compliance ...................................................................................30

Certificate of Service ..........................................................................................31

Appendix ..............................................................................................................31

# INDEX OF AUTHORITIES

## CASES

*City of Dallas v. Stewart*, 361 S.W. 3d 562 (Tex. 2012) ......................................22

*Lower Colorado River Authority, et al, v. Texas Department of Water Resources*, 689 S.W. 2d 873 (Tex. 1984) ................................................................12

*Madden v. Tex. Bd. of Chiropractic Examiners,* 663 S.W.2d 622 (Tex. App. Austin 1985) ..........................................................................................8

*McWatt v. Mattax*, 03-133-00332-CV (Tex. App. – Austin 3-18-2015)...............4, 5

*Oncor Electric Delivery Co. v. Public Utility Commission,* 406 S. W. 3d 253 (Tex. App. Austin 2013) ......................................................................8

*TCEQ v. Texas Farm Bureau, et al*, Cause No. 13-13-00415-CV (13th Court of Appeals, Corpus Christi-Edinburg, April 2, 2015) ......................................10

*Texas State Bd. Of Examiners of Marriage and Family Therapists v. Texas Medical Assn*, No. 03-13-00077-CV, November 21, 2014 ..........................23

*PUC v. City of Austin*, 728 S.W.2d 907 (Tex. App. Austin 1987) .........................22

*Railroad Commission of Texas v. Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619 (Tex. 2011) ..............................................................................6

## TEXAS GOVERNMENT CODE

§2001.174....................................................................................................3,4

## TEXAS WATER CODE

§11.021...................................................................................................9, 20
§11.022.........................................................................................................9
§11.025 ....................................................................................................9, 12
§11.026.........................................................................................................9
§11.027....................................................................................................9, 11
§11.046.................................................................................................9, 15, 16
§11.121.........................................................................................................9

§11.134............................................................................................................9

§11.1381...............................................................................................9, 13, 14

§11.141............................................................................................................9

Case No. 03-14-00416-CV

BRADLEY B. WARE,
*Appellant,*

v.

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,
*Appellee.*

## APPELLANT'S REPLY BRIEF

TO THE HONORABLE THIRD COURT OF CIVIL APPEALS:

Appellant, Bradley B. Ware, submits this Reply Brief in appeal of the Order of the Texas State District Court on administrative appeal affirming the decision of the Texas Commission on Environmental Quality[1] ("TCEQ," "Commission," or "Agency"). This Appeal is from the District Court of Travis County, Texas, 53rd Judicial District, the Honorable John Dietz presiding, in which Appellant was the Plaintiff and Appellee was the Defendant. Appellant Bradley B. Ware may be referred to in this Reply Brief as "Plaintiff," "Appellant," "Ware," or "Mr. Ware;"

---

[1] To avoid unnecessary confusion in this Reply Brief, the Texas Commission on Environmental Quality refers to the Texas Commission on Environmental Quality and any of its predecessor agencies, including the Texas Water Rights Commission, the Texas Department of Water Resources, the Texas Water Commission, and the Texas Natural Resources Conservation Commission.

and Appellee, the Texas Commission on Environmental Quality may be referred to as "Defendant," "Appellee," "TCEQ," "Commission," or "Agency."

## I.   ADDITIONAL PROCEDURAL HISTORY

The prior procedural history of this case is set out in full Appellant's Brief, pp. 5-6, in the Statement of Facts.  The additional procedural history is set out below.

1.   On January 15, 2015, Ware filed his Appellant's Brief, wherein he requested oral argument.

2.   On February 13, 2015, TCEQ filed its Unopposed Motion for Extension of Time for Appellee Texas Commission on Environmental Quality to File Brief.

3.   On February 13, 2015, the Court issued correspondence granting Appellee's Unopposed Motion for Extension of Time for Appellee to File Reply Brief.

4.   On April 17, 2015, TCEQ filed its Appellee's Brief.

## II.   RESTATEMENT AND UPDATE OF STANDARD OF REVIEW

Appellee TCEQ faults Appellant's brief for not including a Standard of Review.  In light of Appellee's comment, Appellee restates the Standard of Review details set out in Appellant's Brief, pp.2-4, under the heading "Statement of the

Case," and updated by recent applicable case law. The Standard of Review is Tex. Gov't Code, §2001.174, which states:

> Sec. 2001.174. REVIEW UNDER SUBSTANTIAL EVIDENCE RULE OR UNDEFINED SCOPE OF REVIEW. If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:
> (1) may affirm the agency decision in whole or in part; and
> **(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:**
> (A) in violation of a constitutional or statutory provision;
> (B) in excess of the agency's statutory authority;
> (C) made through unlawful procedure;
> (D) affected by other error of law;
> (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
> (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
>
> Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.

Plaintiff, Bradley B. Ware appeals from the 53rd Judicial District Court of Travis County, Texas for its failure to overturn the final order of the TCEQ which denied Plaintiff the right to continue to divert and use water under Permit to Appropriate State Water No. 5594 ("Permit No. 5594"), attached hereto as Exhibit A. Appellant asserts that the Commission's April 20, 2010 Final Order of the

TCEQ ("Order") violates extant provisions of the Texas Water Code ("TWC"), and contains reversible legal error.

Generally, as argued below, the Commission's order is in violation of the fundamental precepts of the Constitution of the United States (5th and 14th Amendments) and the Texas Constitution (Art. 1, Bill of Rights, Sections 3 and 19), the Texas Water Code and the Texas Government Code; is in excess of the Commission's statutory authority; is made through unlawful procedure; is affected by numerous other errors of law; is not reasonably supported by substantial evidence when considering the record as a whole; *and* is on its face arbitrary, capricious, and characterized by abuse of discretion, or clearly unwarranted exercise of discretion. The Commission's final order is not entitled to the deference that agency decisions are afforded in a simple substantial evidence factual review.

Put simply, the Commission's April 20, 2010 TCEQ Order is subject to reversal because it finds and concludes that there is State water available for appropriation in the Brazos River Basin in the form of return flows, but reserves the available water to a pending Applicant Brazos River Authority ("BRA") -- not an existing or senior appropriator-- and denies water availability as to Ware's application against the substantial evidence of record and contrary to the prior appropriation doctrine. The trial court erred in failing to recognize these

deficiencies in the Commission's April 20, 2010 Order and erred in rendering its June 11, 2014 order which denied Plaintiff's appeal.

The legal standard for a court's consideration on appeal of the actions of administrative agencies in contested case hearings was enunciated by this Court very recently (March 18, 2015). The opinion in *McWatt v. Mattax*, 03-133-00332-CV (Tex. App. – Austin 3-18-2015) is very clear on the role of the judiciary where questions similar to those urged by Appellant in this case, are involved. The *McWatt v. Mattax, id.,* opinion states the requirements of Tex. Gov't Code, 2001.174:

> Section 2001.174 of the Texas Government Code provides the standard for judicial review of the ALJ's and the Commissioner's orders. *See id[2]*. §2001.174. Under this standard we may not, with respect to questions committed to its discretion, substitute our judgment on the weight of the evidence for that of the agency. *Id. We must, however, reverse an order if it prejudices substantial rights because its findings, inferences, conclusions, or decisions*
> (1) violate a constitutional or statutory provision;
> (2) exceed statutory authority;
> (3) were made through unlawful procedure;
> (4) were affected by other error of law;
> (5) are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
> (6) are arbitrary or capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion. *Id.*
>
> *McWatt v. Mattax, at p. 7*

---

[2] All "id." references in the quote from *McWatt v. Mattax* refer to Texas Gov't Code, § 2001.174(2) (setting forth circumstances requiring reversal of agency's decision in contested case). *McWatt v. Mattax,* p. 6.

Appellant contends that under the extant legal standard of review, Mr. Ware is entitled to a reversal of the April 20, 2010 TCEQ Order and remand of his amendment application for consideration in accordance with applicable facts and full access to water available in the Brazos River Basin on the basis of his senior appropriation under the prior appropriation doctrine.

The statutory *legal standard* is especially important in this case, where Appellee TCEQ clings to its experts' versions of the *facts*, attempting to remove the Court's focus from the TCEQ's violations of constitutional and statutory provisions, exceedance of statutory authority, unlawful procedures, errors of law, and abuse of and clearly unwarranted exercise of discretion. Therefore, the TCEQ should not be allowed to justify its legal missteps in the law by asserting that it has broad discretion to construe the facts in this case under the protection of substantial evidence review. It is well settled that the resolution of constitutional questions such as due process, statutory construction and any other question of law is to reviewed de novo by a court. [See, *Railroad Commission of Texas v. Citizens for a Safe Future & Clean Water*, 336 S.W. 3rd 619, 624 (Tex 2011)] The case is about the adoption by the TCEQ of a regulatory scheme regarding return State water, flows, water availability, and water rights permitting which does not appear in its regulations and is contrary to the statutory directives of the Texas Water Code. The Agency's abuse of discretion and its clearly unwarranted exercise of discretion

are demonstrated in its failure to announce regulations concerning the appropriation of State water in the form of return flows; the implementation of the unwritten regulations first by TCEQ staff during the contested case hearing and then by the Commission without full notice and comment; and the implementation of the unwritten regulations based on the TCEQ's previously unannounced interpretations of the Texas Water Code which are directly contrary to the Texas Water Code's statutory directives.

## III.   INTRODUCTION AND SUMMARY

Citizens of Texas, regardless of their occupation or financial circumstance, have every reason to expect to be treated fairly by their state government and in accordance with applicable law.  In Texas, where water resources are often in short supply, the Texas Legislature adopted the prior appropriation system and, over time, organized a variety of state agencies to implement the doctrine of prior appropriation in accordance with the specific mandates of the Texas Water Code, the general guidelines of our Texas Constitution and applicable laws, and especially in this instance, the substantive and procedural due process mandates of the Texas Administrative Procedures Act. In this case, the staff and Commissioners of the Texas Commission on Environmental Quality substituted their own unwritten scheme of water rights permitting and administration for the legal

mandates of the Texas Legislature and the prior appropriation doctrine. In this case, contrary to the legal mandates of the Texas Legislature, Commission staff developed and implemented a system whereby later applications of some would-be junior appropriators were entitled to consideration based on a complete and full analysis of water availability under the Texas Water Code, and other senior water rights holders, independent of their priority dates, were not entitled to consideration of their applications based on a comprehensive determination of water availability. The courts have held that it is a denial of due process for an agency to fail to adopt any written statements of agency policy regarding such issues as priority dates in existing permits so as to provide *notice* to an applicant of the burden of proof. [See, *Madden v. Tex. Bd. of Chiropractic Examiners*, 663 S.W. 2d 622,626 (Tex. App. Austin 1985); and *Oncor Electric Delivery Co. v. Public Utility Commission*, 406 S. W. 3d 253, 269 (Tex. App. Austin 2013).

This appeal involves a case of first impression. Rather than adhere to the legal mandates of the Texas Water Code, which are set out below for ease of reference, Appellee TCEQ asks this court to accept and to validate its own water rights permitting and administration system, which it has yet to codify in Agency regulations. The most important and applicable provisions which TCEQ seeks to reinterpret to Appellant's detriment are in the following sections of Texas Water Code, Chapter 11:

§ 11.021,   State Water - Asserts State sovereignty over the surface waters of the State in watercourses

§ 11.022,   Acquisition of Right to Use State Water - Provides for the use of State water by authorized appropriators;

§ 11.025,   Scope of Appropriative Right - Sets forth the limitations of the appropriative rights;

§ 11.026,   Perfection of an Appropriation - Provides for perfection of an appropriation by beneficial use in accordance with the permit;

§ 11.027,   Rights Between Appropriators - Provides for resolution of conflict between appropriators on the basis of "first in time is first in right;"

§ 11.046,   Return Surplus Water - Provides that water authorized to be appropriated but not needed for the authorized use be returned to the watercourse for further appropriation and for other uses;

§ 11.121,   Permit Required - Requires the issuance of water rights permits to authorize appropriation

§ 11.134,   Action on Application - Specifies the conditions under which the Commission may grant a water rights permit;

§ 11.1381, Term Permits - Establishes a means for issuance of term permits; and

§ 11.141,   Date of Priority - Establishes the priority date for water rights permits as the date the application was filed.


Taken as whole, the provisions of the Texas Water Code establish the regulatory framework for the administration of Texas water rights.

At the same time, the water rights program which TCEQ now informs the Court that it is implementing through the factual assertions of its water rights permitting staff cannot be allowed to substitute for the legal mandates and fundamental fairness of the "first in time, first in right" principles of Texas water law which have withstood the test of generations of continued economic growth and must continue to be the legal basis of water rights administration by the TCEQ. The Texas Legislature has not authorized the TCEQ to determine water availability based on which applicants it would like to grant rights in State water to, regardless of priority dates. Generally, in its Reply Brief, the TCEQ informs the Court that "this is how we administer water rights at the TCEQ," in a manner which is contrary to law, has no statutory support, and is contrary to the plain terms and conditions of the Commission's Final Orders and the Permit to Appropriate State Water No. 5594 issued by the Commission. This Court of Appeals, as the Corpus Christi-Edinburg Court of Appeals did recently in *TCEQ v. Texas Farm Bureau, et al*, Cause No. 13-13-00415-CV (13th Court of Appeals, Corpus Christi-Edinburg, April 2, 2015) can honor the doctrine of separation of powers and inform the TCEQ that it must follow the doctrine of prior appropriation for all water rights holders.

Appellant TCEQ's brief contains no case law, statutory basis, or Commission regulation in support of its contention that it can grant or deny water

rights without reference to the priority dates included in the permits. Consequently, the standards of substantial evidence review require a result in favor of Appellant. The actions of the TCEQ in denying Mr. Ware's renewal of his term permit are arbitrary, capricious, founded upon unlawful procedure, and constitute an unreasonable denial of Appellant's property right in State water.

## IV. WARE'S REPLY TO APPELLEE TCEQ'S BRIEF PERTAINING TO ALL OF WARE'S POINTS OF ERROR

The main contention of TCEQ in this appeal relating all Appellant's Points of Error is that the Commission is entitled to implement a policy of water rights permitting and administration whereby some State water in the form of return flows is reserved for later applicants, as opposed to being considered available for appropriation in accordance with the first in time, first in right principle of the prior appropriation doctrine set forth in Tex. Water Code §11.027, which states:

> RIGHTS BETWEEN APPROPRIATORS. As between appropriators, the first in time is the first in right.
>
> Amended by Acts 1977, 65th Leg., p. 2207, ch. 870, Sec. 1, eff. Sept. 1, 1977.

TCEQ staff contends that term permit holders are not appropriators, or are a separate class of appropriators with a floating priority date.

As both Appellant and Appellee have stated, the statutory authorization to issue term permits came about because the Texas Supreme Court specifically found that the Commission practice of issuing permits based on streamflows and assuming that not all permitted water would be put to beneficial use by existing permittee was unlawful double permitting of already appropriated water. See, *Lower Colorado River Authority v. Texas Department of Water Resources*, 689 S.W. 2d 873 (Tex. 1984), sometimes referred to as the *Stacy Dam Decision.* In that case, the Texas Supreme Court stated:

> Under the law, the Department [of Water Resources] may not grant permits when its own records show that the supply must come from an existing downstream permittee's water that the Department speculates he will not actually need. [TWC] Section 11.025[3] places a limit on the amount of water that can be used beneficially or the amount the senior holders can claim, even though the face amount of their permits may be more.
>
> \* \* \* \* \*
>
> The Water District [LCRA] and the Department have a remedy expressly granted by the Legislature. If there exists recorded permits, filings and certificate of adjudication that will not reasonably be used in the future, the Department or another interested party may seek total or partial cancellation of those rights. Only after sufficient cancellations have freed that water from its commitment, may the Department again grant a permit to appropriate it. *Id.,* at p. 882.

---

[3] Tex. Water Code, Sec. 11.025. SCOPE OF APPROPRIATIVE RIGHT. A right to use state water under a permit or a certified filing is limited not only to the amount specifically appropriated but also to the amount which is being or can be beneficially used for the purposes specified in the appropriation, and all water not so used is considered not appropriated.

As a result of the Stacy Dam Decision, the Commission was temporarily prohibited from issuing new water rights based on permitted water not being put to beneficial use.

Appellee TCEQ's assertions regarding the nature of term permits as not being permanent water rights and subject to full access to water availability is inconsistent with written Agency policy and the water code. Specifically, Tex. Water Code, §11.1381 establishes the TCEQ's right to issue term permits as follows:

> Sec. 11.1381. TERM PERMITS. (a) Until a water right is perfected to the full extent provided by Section 11.026 of this code, the commission may issue permits for a term of years for use of state water to which a senior water right has not been perfected.
> (b) The commission shall refuse to grant an application for a permit under this section if the commission finds that there is a substantial likelihood that the issuance of the permit will jeopardize financial commitments made for water projects that have been built or that are being built to optimally develop the water resources of the area.
> (c) The commission shall refuse to grant an application for a term permit if the holder of the senior appropriative water right can demonstrate that the issuance of the term permit would prohibit the senior appropriative water right holder from beneficially using the senior rights during the term of the term permit. Such demonstration will be made using reasonable projections based on accepted methods.
> (d) A permit issued under this section is subordinate to any senior appropriative water rights.
>
> Added by Acts 1987, 70th Leg., ch. 405, Sec. 1, eff. Sept. 1, 1987.

Effective September 1, 1987, the Commission was authorized to issue water rights for unspecified terms to allow for the use of state water not being put to beneficial use. Read together, the Stacy Dam Decision and TWC, §11.1381 authorized the Commission to issue permits for available streamflows not needed by senior downstream water rights holders[4] until such time as water became available as permits were cancelled for total or partial nonuse under the Texas Water Code's cancellation provisions in TWC, Ch. 11, Subch. E, §§11.171-11.186. Term Permits are specifically subject to the same requirements of all permits under TWC, §11.134(b), Action on Application, and those same requirements are clarified and emphasized in TWC, §13.1381 specifically identifying public interest concerns of the financial viability of water projects (§11.1381(b), and the specific opportunity for a demonstration of harm by a senior appropriator (§11.1381(b). But, the limitation of TWC, §11.1381(d), that "A permit issued under this section is subordinate to any senior appropriative water rights" is no different from the general limitations of the doctrine of prior appropriation. Every single water rights permit issued by the Commission for any purpose or for any length of time contains the proviso: "This permit [or amendment] is issued subject to senior and superior water rights in the _____ River Basin." This proviso is not unique to term permits. Even if it were, there is no seniority or superiority as between an

---

[4] Note that this refers to senior downstream water rights holders, not applicants, perspective water rights holders or junior water rights holders.

authorized appropriator and an applicant. As between *appropriators*, first in time is first in right; Appellant does not claim or request a water right to divert and use water already permitted to senior appropriators.

In addition to authorizing the issuance of term permits for permitted but unused water in TWC, §11.1381, however, the Texas Legislature made additional water available for appropriation under TWC, §11.046. In many ways, TWC, §11.046 is a codification of the previous Commission analysis of permits being limited to the water actually being beneficially used by the permittee; and allowing the Commission to authorize new appropriations for water returned to the stream after its permitted use. TWC, §11.046 states as follows:

> Sec. 11.046. RETURN SURPLUS WATER. (a) A person who takes or diverts water from a watercourse or stream for the purposes authorized by this code shall conduct surplus water back to the watercourse or stream from which it was taken if the water can be returned by gravity flow and it is reasonably practicable to do so.
> (b) In granting an application for a water right, the commission may include conditions in the water right providing for the return of surplus water, in a specific amount or percentage of water diverted, and the return point on a watercourse or stream as necessary to protect senior downstream permits, certified filings, or certificates of adjudication or to provide flows for instream uses or bays and estuaries.
> (c) Except as specifically provided otherwise in the water right, water appropriated under a permit, certified filing, or certificate of adjudication may, prior to its release into a watercourse or stream, be beneficially used and reused by the holder of a permit, certified filing, or certificate of adjudication for the purposes and locations of use provided in the permit, certified filing, or certificate of adjudication. **Once water has been**

**diverted under a permit, certified filing, or certificate of adjudication and then returned to a watercourse or stream, however, it is considered surplus water and therefore subject to reservation for instream uses or beneficial inflows or to appropriation by others unless expressly provided otherwise in the permit, certified filing, or certificate of adjudication.**

(d)  Water appropriated under a permit, certified filing, or certificate of adjudication which is recirculated within a reservoir for cooling purposes shall not be considered to be surplus for purposes of this chapter.

Amended by Acts 1977, 65th Leg., p. 2207, ch. 870, Sec. 1, eff. Sept. 1, 1977;  Acts 1997, 75th Leg., ch. 1010, Sec. 2.07, eff. Sept. 1, 1997.

The additional water—return flows—referred to in TWC, §11.046(c) is specifically water which is returned to a stream after use, such as a municipal discharge, for example, and the water becomes available for environmental purposes "or to appropriation by others."  Nothing in TWC, §11.046(c) authorizes the TCEQ to treat the appropriation of return flows in manner other than on a first in time, first in right basis.

In Appellee's Brief, TCEQ attempts to convince the Court that Ware's water right was a not a permanent water right and that Permit to Appropriate State Water No. 5594 had no priority date, expired by its own terms, and was part of a separate class of water rights not entitled to consideration under the prior appropriation doctrine.  The TCEQ's argument rests entirely on its own policy of expedience; TCEQ has offered no basis beyond its non-lawyer expert staff assertions in favor

of these "unwritten rules" and statutory interpretations which fall outside of the Agency's historical practice and factual determinations of water available for appropriation. Simply put, there is no law which supports the TCEQ's position in this case; the doctrine of prior appropriation favors Appellant.

Not only do these TCEQ assertions have no basis in statute, but they are directly contrary to the plain language of Ware's Permit No. 5594. Permit No. 5594 grants a water right with a priority date for a term of years, and states explicitly:

> 3.    SPECIAL CONDITIONS
> The authorization to divert and use 130 acre-feet of water per year shall expire and become null and void on November 7, 2007 unless prior to such date permittee applies for an extension hereof and such application is subsequently granted for an additional term or in perpetuity. **The priority date of this permit and all extensions hereof shall be July 1, 1997.**

It is undisputed that Appellant filed his application prior to November 7, 2007; that the TCEQ found the application to be administratively complete on March 20, 2006; and that the TCEQ issued notice of the application stating that Ware:

> "has applied for an amendment to its existing Water Use Permit on the Lampasas River, Brazos River Basin, in Bell County to **extend or delete the expiration date of November 7, 2007,** add an additional 31 acres for irrigation, and to divert and use an additional 20 acre-feet of water[5]."

---

[5] See TCEQ Interoffice Memorandum dated March 20, 2006, SUBJECT: Bradley B. Ware; CN601474224, RN102842416; Application No. 5594A to Amend Water Use Permit No. 5594;

It is simply not true, as TCEQ asserts in Appellee's Brief, that water rights issued for a term of years were not issued with priority dates and were not therefore subject to periodic review and consideration of water availability during that review.

More importantly, TCEQ's assertion goes against the evidence in the case which establishes that the TCEQ policy on amendment of term permit water rights holders was to grant permanent water rights when, upon review of the amendment applications, it was found that water was available for appropriation in the requested source of supply. The undisputed evidence in this case establishes that Samuel W. Jones, P. E. a former TCEQ employee and part owner of water rights Permit No. 4166, as amended, was granted a permit for diversion and use of 120 acre-feet of water from Brushy Creek in Williamson County for a term of years on December 18, 1984 with a July 31, 1984 priority date. He applied for an amendment similar to Appellant's (increase in irrigation acreage) in 2000 and was granted a perpetual water right with an April 26, 1984 priority date.[6] The simple truth is that in this case, the TCEQ, in reviewing water availability in the Brazos

TWC §11.122, Requiring Mailed and Published Notice; Lampasas River, Brazos River Basin; Bell County, attached hereto as Exhibit C.

[6] This priority date which appears in the preamble of Permit No. 4166A appears to be an error, and the use of the date Application No. 4470 for Permit No. 4166 was received, rather than the date it was filed, which was correctly set out in the Special Condition 3. (b), of Permit No. 4166, which stated: The priority date for this permit and all extension hereof shall be July 31, 1984.

River Basin, found that it was only available for BRA and that the same State water which flowed past Appellant's diversion point associated with his earlier priority, should not be made available to Mr. Ware.

## IV.  WARE'S REPLY TO APPELLEE TCEQ'S BRIEF PERTAINING TO WARE'S POINT OF ERROR NO. 1

Ware's Point of Error One:
The District Court erred in failing to find that the Commission's April 20, 2010 Order unlawfully ignores the evidence of record regarding the water available for appropriation by Plaintiff; therefore, the Commission's action in adopting the April 20, 2010 Order was arbitrary and capricious, and was characterized by an abuse of discretion.

In Appellee's Brief, the TCEQ's claim that return flows are not available to Appellant, rests on an unauthorized and unlawful attempt to create a separate class of State water, return flows, to be administered by the TCEQ under some basis other than first in time, first in right, priority system of property rights in State water.  Again, the TCEQ's brief presents no Agency rule or statute which supports the TCEQ staff factual assertions.  There is no legitimate factual issue as to whether return flows are available for appropriation throughout the Brazos River Basin—Appellant's contested case hearing Exhibit No. 50, attached hereto as Exhibit B, a November 25, 2008 Water Availability Analysis regarding Application No. 5851 by Brazos River Authority specifically details the points of

discharge of over 100 million gallons per day in authorized discharges of treated domestic wastewater effluent—return flows—which remain unappropriated. There is no legal justification for reserving these return flows for a junior applicant, while at the same time acting to terminate the water use of senior appropriators on the basis that no water is available for appropriation throughout the Brazos River Basin.[7]

Texas Water Code, §11.021 defines State water as follows:

> Sec. 11.021. STATE WATER. (a) The water of the ordinary flow, underflow, and tides of every flowing river, natural stream, and lake, and of every bay or arm of the Gulf of Mexico, and the storm water, floodwater, and rainwater of every river, natural stream, canyon, ravine, depression, and watershed in the state is the property of the state.
> (b) Water imported from any source outside the boundaries of the state for use in the state and which is transported through the beds and banks of any navigable stream within the state or by utilizing any facilities owned or operated by the state is the property of the state.

Texas Water Code, §11.046 defines return flows, treated effluent wastewater discharges, and makes them available for appropriation as stated above.

Return flows are State water, subject to appropriation in accordance with the prior appropriation doctrine. There is no statutory basis which allows TCEQ to reserve the use of State water in the form of return flows for potential junior appropriators. The hearing testimony of TCEQ staff members regarding the TCEQ

---

[7] TCEQ's Finding of Fact No. 44-52.

uncodified policy to develop and apply certain water availability analyses for certain applicants produces an unlawful reservation of State water which runs counter to the prior appropriation doctrine principle of "first in time, first in right." The water availability analysis of the full amount of State water available for appropriation throughout the Brazos River Basin, Appellant's contested case hearing Exhibit No. 50, showed that there are at least 580 acre-feet/year of unappropriated return flows from the City of Lampasas which flow past Appellant's Ware Farm diversion point. Appellant TCEQ can point to no statutory or regulatory authority which authorizes the TCEQ to withhold those return flows from Appellant, and attempt to award them to BRA.

## V.    WARE'S REPLY TO APPELLEE TCEQ'S BRIEF PERTAINING TO WARE'S POINT OF ERROR NO. 2 AND 5

Ware's Point of Error Two:
The Commission's April 20, 2010 Order violates the directives and requirements of Texas Water Code, §11.134(b), regarding Commission action on water rights applications.

Ware's Point of Error Five:
The District Court erred in failing to find that the Commission acted arbitrarily and capriciously to deprive Plaintiff of any continued right to divert and use any water at any time for Ware Farm under Permit No. 5594, an authorized appropriation, on the stated basis of no water available for appropriation, while at the same time granting water rights for new appropriations and issuing statements of water availability for other Plaintiffs, new permittees, and other water rights holders.

In Appellee's Brief, the TCEQ again puts forward the assertions of TCEQ non-lawyer experts as dispositive of the legality of the TCEQ's unwritten law of water rights permitting and administration concerning the availability of State water in the form of return flows on a basis other than the prior appropriation doctrine. TCEQ even goes so far as to say that the statutory framework set out in the Texas Water Code regarding the availability of return flows for appropriation is not significant. TCEQ staff's and Commission's erroneous construction of the Texas Water Code is not controlling is this court in the guise of a substantial evidence review. It is well settled that the court is the ultimate arbiter of statutory construction, even though State agencies are allowed to construe enabling statutes as they perform their duties. [See, *City of Dallas v. Stewart*, 361 S.W. 3d 562,579 (Tex. 2012); and *PUC v. City of Austin*, 728 S.W. 2d 907, 910 (Tex. App. Austin 1987)] Agencies and Staff are simply not legally authorized to develop and implement policies which are directly contrary to or even unsupported by statutory mandates.

The text of Texas Water Code, §11.027; §11.135(b); §11.1381; and §11.046 is plain and unambiguous. Therefore, the tortured statutory interpretations of the TCEQ non-lawyer staff which run counter to the prior appropriation doctrine should be disregarded. It simply is not the case that the statutes do not mean what they plainly state and that water available for appropriation can be reserved for

what could only be a junior appropriator while senior appropriators are denied access to those return flows.

Therefore, the Agency's construction of the Texas Water Code, §11.027; §11.135(b); §11.1381; and §11.046 are not entitled to judicial deference because the subject sections are completely unambiguous. This court has recently held that deference should be given to an agency's interpretation of statutes only when the statutory authority is ambiguous. *Texas State Bd. Of Examiners of Marriage and Family Therapists v. Texas Medical Assn*, No. 03-13-00077-CV, November 21, 2014, citing *Entergy Gulf States, Inc. v. Summers*, 282 S.W. 3d 433, 437 (Tex. 2009).

## VI.  WARE'S REPLY TO APPELLEE TCEQ'S BRIEF PERTAINING TO WARE'S POINT OF ERROR NO. 3

Ware's Point of Error Three:
The District Court erred in failing to find that the Commission's April 20, 2010 Order is in violation of the requirements of Texas Water Code, §11.1381, regarding the consideration and granting of water rights permits for a term of years.

In Appellee's Brief, TCEQ attempts to convince the Court that specifically quantified return flows shown to be available from various sources throughout the Brazos River Basin and passing downstream to the authorized diversion point for

Permit No. 5594 should not be available to Appellant, but should be made available to a later applicant, BRA.

TCEQ's contention that the water is available only at the mouth of the Brazos River directly contradicts the water availability analysis of Application No. 5851, Appellant's contested case hearing Exhibit No. 50, which identifies not only the specific locations, but also **the specific amounts of return flows available upstream of Ware Farm.**  TCEQ's contention that State water is available in the Brazos River Basin to BRA, a later applicant, but not to Ware, an earlier appropriator makes no sense, and is not factually correct.  It is simply not true that State water is available in large quantities for a later applicant, but a much smaller quantity of water is not available for a senior appropriator.  And, any policy of the TCEQ which provides for that result is unlawful.

## VII.   WARE'S REPLY TO APPELLEE TCEQ'S BRIEF PERTAINING TO WARE'S POINT OF ERROR NO. 4

Point of Error Four:
The District Court in failing to find that the Commission's April 20, 2010 Order violates the fundamental doctrine of water rights law of "first in time, first in right," as set forth in the Texas Water Code, Section 11.027.

In Appellee's Brief, TCEQ asserts that Permit No. 5549's 1997 priority date is meaningless and should be given no consideration as compared to later applicants for water rights.  Again, other than the assertions of TCEQ staff, and

Appellee TCEQ in its Brief, TCEQ offers no applicable law in support of this contention. Not a single written or adopted rule of the TCEQ or statutory interpretation authorizes the TCEQ's position. Moreover, for the TCEQ staff in the context of a contested case hearing to assert this "revision" of a water rights permit issued by the Agency pursuant to a final order over which the Agency has long lost jurisdiction, amounts to the Staff unlawfully collaterally attacking the validity of its own final order.

TCEQ's continual assertion that Ware's priority date is meaningless contradicts the terms of the Final Order of the Commission, which is set forth in 3. Special Condition (b) of Permit No. 5499, and has no legal support.

## VIII. WARE'S REPLY TO APPELLEE TCEQ'S BRIEF PERTAINING TO WARE'S POINT OF ERROR NO. 6

Point of Error Six:
The District Court erred in failing to find that the Commission's April 20, 2010 Order adopted Findings of Fact pertaining to a pending non-party applicant; Moreover, the details of said Plaintiff's pending application and *proposed* appropriation were unlawfully used as a basis to deny Plaintiff's water right application.

In Appellee's Brief, TCEQ asserts that findings regarding BRA were made necessary by Applicant's use of the Brazos River Basin Water Availability Analysis applied to the BRA application. TCEQ also asserts that the Brazos River

Basin Water Availability Analysis contained in Appellant's contested case hearing Exhibit No. 50 is "irrelevant." TCEQ's assertion that the Brazos River Basin water availability analysis related to Application No. 5851 by BRA and detailing the availability of yet to be appropriated return flows is directly contrary to the first in time first in right doctrine of prior appropriation, and has no legal support. More importantly, TCEQ's reliance on staff testimony in a contested case hearing to explain away the relevance of water available for appropriation under TWC, §11.046 only highlights the Commission's lack of regulatory support for its implementation of an unauthorized and unwritten water rights permitting and administration system regarding return flows.

## IX.   CONCLUSION

As discussed above, the Commission's April 20, 2010 Order denying Appellant's water rights Amendment Application No. 5594 to continue to divert and use his authorized appropriation of 130 acre-feet of water per year from the Lampasas River, Brazos River Basin, should be reversed and remanded to the TCEQ in accordance with Tex. Gov't Code, §2001.174. The TCEQ's April 20, 2010 Order violates the Texas Water Code, the Texas Constitution, and the Constitution of the United States and is voidable and reversible for the following reasons:

(1)     In this case, the TCEQ created an unwritten parallel system of water rights related, at Commission Staff discretion, only to term permits, which deprived those permits and the authorizations to appropriate State water of their legal priority;

(2)     The TCEQ, contrary to the plain terms and conditions of Appellant's Permit to Appropriate State Water No. 5594, stated that Appellant's July 1, 1997 priority date did not apply to this amendment Application No. 5594A;

(3)     The TCEQ Water Availability Analysis of the Brazos River Basin dated November 28, 2008, details the location and extent of over 100 million gallons per day in return flows available for appropriation throughout the Brazos River Basin;

(4)     In this case, the TCEQ staff and Commissioners have implemented an unwritten water rights permitting and administration program related to State Water in the form of return flows;

(5)     In their final order in this case, the TCEQ has refused to recognize the presence of State Water in the form of return flows shown to be available at Appellant's diversion point in its Brazos River Basin Water Availability Analysis Model as available for appropriation pursuant to Tex. Water Code, §11.046(c); and

(6) The unwritten TCEQ policies and procedures regarding State water in the form of return flows do not provide for allocation of return flows on a first in time, first in right basis.

The tacit adoption of these unlawful and statutorily inconsistent policies in the Findings of Fact and Conclusions of Law in the TCEQ's April 20, 2010 Order render the action of the TCEQ voidable as a matter of law pursuant to Tex. Gov't Code, §2001.174.

Apart from being unlawful, the Commission's role in administering water rights is called into question when it denies a family farmer access to water available for appropriation in the Brazos River Basin for continued diversion and use of water for any term at all on the one hand, and yet supports the issuance of perpetual permits for the use of State water in the form of return flows and based on updated streamflow conditions and data sets for other, later water rights applicants on the other hand.

# X. PRAYER FOR RELIEF

WHEREFORE, CONSIDERING THE FOREGOING, Plaintiff asks this Court to:

A.  Reverse the Texas Commission on Environmental Quality's unlawful April 20, 2010 Order denying the Application of Bradley B. Ware to Amend his Permit to Appropriate State Water No. 5594;

B.  Remand Appellant's water rights Amendment Application No. 5594A to the TCEQ for further and lawful consideration of Appellant's application based on the evidence of record of State Water available for appropriation in the Brazos River Basin in the form of return flows;

C.  Require the consideration of Appellant's water rights Amendment Application No. 5594A to be consistent with the Texas Water Code and all applicable law, and not subject to any unwritten, unlawful and statutorily inconsistent policies for permitting and administration of State water; and

D.  Provide such other and further relief that Appellant may show himself to be justly entitled.

Respectfully Submitted,

**WEBB & WEBB**
Attorneys at Law
712 Southwest Towers
211 East 7th Street
Austin, Texas 78701
(512) 472-9990 Telephone
(512) 472-3183 Facsimile

GWENDOLYN HILL WEBB
g.hill.webb@webbwebblaw.com
State Bar No. 21026300
STEPHEN P. WEBB
s.p.webb@webbwebblaw.com
State Bar No. 21033800
ATTORNEY FOR APPELLANT,
BRADLEY B. WARE

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this reply brief contains 6,767 words (excluding the caption, table of contents, table of authorities, signature, proof of service, certification, and certificate of compliance). This is a computer generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

Gwendolyn Hill Webb

# CERTIFICATE OF SERVICE

I hereby certify that I have this 7th day of May, 2015, served copies of the foregoing instrument upon the parties to this proceeding, who's full and complete names and addresses appear below, by certified mail, facsimile, hand delivery, or regular U.S. mail.

Linda Secord, Asst. Attorney General
Office of the Attorney General
P.O. Box 12548-MC015
Austin, Texas 78711-2548
Phone: 512-475-4002
Fax:    512-320-0911
Linda.secord@texasattorneygeneral.gov

Gwendolyn Hill Webb

# APPENDIX

Exhibit A.   Permit to Appropriate State Water No. 5594

Exhibit B.   November 25, 2008 Interoffice Memorandum regarding Water Availability Analysis for BRA's Application No. 5851

Exhibit C.   March 20, 20016 Interoffice Memorandum Requiring Mailed and Published Notice

# TEXAS NATURAL RESOURCE CONSERVATION COMMISSION



## PERMIT TO APPROPRIATE
## AND USE STATE WATER

APPLICATION NO. 5594      PERMIT NO. 5594      TYPE: Section 11.121

Name:      Bradley B. Ware      Address:      Rte. 3, Box 211
Killeen, TX 76542

Filed:      July 1, 1997      Granted:    **NOV 0 7 1997**

Purposes:      Irrigation      County:      Bell

Watercourse:      Lampasas River, tributary    Watershed:      Brazos River Basin
of the Little River, tributary
of the Brazos River

WHEREAS, Bradley B. Ware has requested authorization to divert and use not to exceed 130 acre-feet of water per annum to irrigate 100 acres of land owned by the applicant in Bell County approximately 15 miles southwest of Killeen, Texas; and

WHEREAS, the Texas Natural Conservation Commission finds that jurisdiction over the application is established; and

WHEREAS, no person protested the granting of this application; and

WHEREAS, the Commission has complied with the requirements of the Texas Water Code and Rules of the Texas Natural Resource Conservation Commission in issuing this permit.

NOW, THEREFORE, this permit to appropriate and use State Water is issued to Bradley B. Ware, subject to the following terms and conditions:

1. USE

    Permittee is authorized to divert and use not to exceed 130 acre-feet of water per annum from the Lampasas River to irrigate 100 acres of land out of 261 acres in the W. Brown Survey, Abstract No. 67, the D.G. Van Vicheton (Vecheton)

1



EXHIBIT

A

Survey, Abstract No. 851, and the C. Edwards Survey, Abstract No. 291 in Bell County, Texas approximately 15 miles southwest of Killeen, Texas. This land is conveyed to permittee in a deed recorded in Volume 1524, page 671 of the Bell County Deed Records.

2. DIVERSION

    a.    Diversion Area: Permitte is authorized to divert water from any point on the left or east bank of the Lampasas River, between a point N60.6°W 2,050 feet from the southeast corner of the aforesaid Van Vicheton Survey and a point located S37°E 4,200 feet from the aforesaid survey corner in Bell County. This downstream point is located at Latitude 31.032°N, Longitude 97.992°W.

    b.    Maximum Diversion Rate: 2.67 cfs (1200 gpm).

3. SPECIAL CONDITIONS

    a.    In order to protect instream uses, biological habitats and water quality, permittee is authorized to divert water hereunder during the months of April through June only when the flow of the Lampasas River at U.S.G.S. Gaging Station No. 08103800 near Kempner, Texas equals or exceeds 38 cfs and during the other months only when it equals or exceeds 12 cfs.

    b.    The authorization to divert and use 130 acre-feet of water per year shall expire and become null and void on _November 7, 2007_ unless prior to such date permittee applies for an extension hereof and such application is subsequently granted for an additional term or in perpetuity. The priority date of this permit and all extensions hereof shall be July 1, 1997.

4. WATER CONSERVATION

Permitee shall implement a water conservation plan that provides for the utilization of those practices, techniques, and technologies that reduce the consumption of water, prevent or reduce the loss or waste of water, maintain or improve the efficiency in the use of water, or increase the recycling and reuse of water so that a water supply is made available for future or alternative uses.

This permit is issued subject to all superior and senior water rights in the Brazos River Basin.

Permittee agrees to be bound by the terms, conditions and provisions contained herein and such agreement is a condition precedent to the granting of this permit.

All other matters requested in the application which are not specifically granted by this permit are denied.

This permit is issued subject to the Rules of the Texas Natural Resource Conservation Commission and to the right of continuing supervision of State water resources exercised by the Commission.

TEXAS NATURAL RESOURCE
CONSERVATION COMMISSION

For the Commission

DATE ISSUED: NOV 0 7 1997

ATTEST:

Eugenia K. Brumm, Ph.D., Chief Clerk

3

# Texas Commission on Environmental Quality

### INTEROFFICE MEMORANDUM

To:             Ron Ellis, Application Manager                    November 25, 2008
                Water Rights Permitting Team

Through:        Lann Bookout, Team Leader
                Surface Water Availability & Interstate Compacts Team

From:           Kathy Alexander, Hydrologist
                Surface Water Availability & Interstate Compacts Team

Subject:        Brazos River Authority
                Application 5851
                CN600506794
                Brazos River, Brazos River Basin

## WATER AVAILABILITY ANALYSIS

### Application Summary

The Brazos River Authority (BRA or the Authority) has applied for a permit, designated its "System Operation Permit". The BRA owns the following water rights, which comprise BRA's system of reservoirs: Certificate No. 12-5155 (Possum Kingdom Lake), Certificate No. 12-5156 (Lake Granbury), Certificate No. 12-5165 (Lake Limestone), Certificate No. 12-5157 (Lake Whitney), Certificate No. 12-5160 (Lake Belton), Certificate No. 12-5159 (Lake Proctor), Certificate No. 12-5164 (Lake Somerville), Certificate No. 12-5161 (Lake Stillhouse Hollow), Certificate No. 12-5163 (Lake Granger), Certificate No. 12-5162 (Lake Georgetown) and Certificate No. 12-5158 (Lake Aquilla). The BRA, along with the Texas Water Development Board and the City of Houston, owns Water Use Permit 2925A (Allens Creek Reservoir). The BRA also owns Certificate Nos. 12-5166 and 12-5167, which authorize various uses of water within the applicant's other certificates and permits. The applicant is currently authorized, pursuant to a TCEQ order, to manage and operate its tributary reservoirs as elements of a system, coordinating releases and diversions from the tributary reservoirs with releases and diversions from the applicant's main-stem reservoirs to conserve water.

BRA seeks a Water Use Permit to authorize:

- A new appropriation of state water in the amount of 421,449 acre-feet per year for multiple use purposes on a firm basis in the Brazos River Basin. Out of the 421,449 acre-feet per year of unappropriated water being requested, the maximum amount of unappropriated water that will be available if such water is diverted upstream at USGS gage No. 08091000 near Glen Rose, Texas is 150,538 acre-feet per year of firm water, and if such unappropriated water is diverted upstream at USGS gage No. 08098290 near Highbank, Texas, the maximum amount of unappropriated water that will be available at that location is 144,306 acre-feet per year of firm water.

- Diversion of the water from: (i) the existing diversion points authorized by BRA's existing water rights; (ii) the Brazos River at the USGS gage No. 08091000 near Glen Rose, Texas; (iii) the Brazos River at USGS gage No. 08098290 near Highbank, Texas; (iv) the Brazos River at the

EXHIBIT
B

Gulf of Mexico; and (v) at such other diversion points that may be identified and included in BRA's proposed Water Management Plan (WMP), which is subject to TCEQ's approval.

- Use of up to 90,000 acre-feet of water per year of the firm supply to produce, along with other unappropriated flows, an interruptible water supply of 670,000 acre-feet per year and the appropriation of that interruptible water supply. Out of the 1,001,449 acre-feet of firm and interruptible water being requested, the maximum amount of firm and interruptible water that will be available if such water is diverted upstream at USGS Gage No. 08091000 near Glen Rose, Texas is 60,538 acre-feet of firm water per year and 157,000 acre-feet of interruptible water per year and if such water is diverted upstream at USGS Gage No. 08098290 near Highbank, Texas, the maximum amount of firm water is 54,306 acre-feet of water per year and 303,000 acre-feet of interruptible water per year.

- An exempt interbasin transfer authorization to use, on a firm and interruptible basis, the appropriated water in the adjoining San Jacinto-Brazos Coastal Basin and the Brazos-Colorado Coastal Basin.

- An appropriation of current and future return flows (treated sewage effluent and brine bypass/return) to the extent that such return flows continue to be discharged or returned into the bed and banks of the Brazos River, its tributaries, and BRA's reservoirs. BRA indicates that such appropriation of return flows would be subject to interruption by direct use or indirect use within the discharging entity's city limits, extraterritorial jurisdiction, or contiguous water certificate of convenience and necessity boundary. Specified discharge points and amounts of water will be accounted for on a monthly basis as part of BRA's WMP, which is subject to TCEQ's approval.

- Operational flexibility to (i) use any source of water available to BRA to satisfy the diversion requirements of senior water rights to the same extent that those water rights would have been satisfied by passing inflows through the BRA's reservoirs on a priority basis; and (ii) release, pump and transport water from any of the BRA's reservoirs for subsequent storage, diversion and use throughout the BRA's service area.

- Recognition that the System Operation Permit will prevail over inconsistent provisions in the BRA's existing water rights regarding system operation.

- Use of the bed and banks of the Brazos River, its tributaries and BRA's reservoirs for the conveyance, storage, and subsequent diversion of (i) water appropriated under this application; (ii) waters that are being conveyed via pipelines and subsequently discharged into the Brazos River, its tributaries or stored in the BRA's reservoirs; (iii) surface water imported from areas located outside the Brazos River Basin for subsequent use; (iv) in-basin surface water and groundwater subject to BRA's control;(v) waters developed from future projects; and (vi) current and future reuse of surface and groundwater based effluent requested by this application. This bed and banks authorization is subject to BRA, after identifying specific points of discharge and diversion and conveyance and other losses, obtaining future authorizations to satisfy the requirements of TWC § 11.042. Such points of discharge and diversion and conveyance and other losses may also be identified and included in BRA's proposed WMP, which is subject to TCEQ's approval.

Until the construction of Allens Creek Reservoir is completed, the BRA requests that the System Operation Permit include special conditions which authorize:

- Appropriation of state water in the amount of 425,099 acre-feet per year for multiple use purposes on a firm basis in the Brazos River Basin. Out of the 425,099 acre-feet per year of unappropriated water being requested, the maximum amount of unappropriated water that will be available if such water is diverted upstream at USGS Gage 08091000 near Glen Rose, Texas is 150,538 acre-feet per year of firm water and if such unappropriated water is diverted upstream at USGS Gage 08098290 near Highbank, Texas the maximum amount of unappropriated water that will be available is, at that location, 175,306 acre-feet per year firm water.

- Use of up to 90,000 acre-feet of water per year of BRA's firm supply to produce, along with other unappropriated flows, an interruptible water supply of 869,000 acre-feet per year. Out of the 1,204,099 acre-feet of firm and interruptible water being requested, the maximum amount of firm and interruptible water that will be available if such water is diverted upstream at USGS Gage No. 08091000 near Glen Rose, Texas, will be 60,538 acre-feet of firm water per year and 190,000 acre-feet of interruptible water per year and if such water is diverted upstream at USGS Gage No. 08098290 near Highbank, Texas the maximum amount of firm water will be 85,306 acre-feet of water per year and 284,000 acre-feet of interruptible water per year.

- Exempt interbasin transfer authorization to use, on a firm and interruptible basis, the appropriated water in the adjoining San Jacinto-Brazos Coastal Basin and the Brazos-Colorado Coastal Basin and to transfer such water to any county, municipality or the municipality's retail service area that is partially in the Brazos River Basin for use in that part of the county or municipality's retail service area not within the Brazos River Basin.

## Water Availability Analysis

The Commission's Water Availability Model (WAM) for the Brazos River Basin protects existing water rights based on the prior appropriation doctrine. The period of record for the Brazos WAM is 1940 through 1997. The application was declared administratively complete on October 15, 2004. TCEQ Resource Protection Staff recommends that the application be subject to special conditions to protect aquatic habitat and the environment, including the following (For specific numeric values for the flow requirements below, refer to the Resource Protection Staff memo dated November 25, 2008):

1. Total storage in Permittee's system reservoirs is the trigger for determining hydrologic condition, which, in turn, determines instream flow requirements.
2. Interim instream flow requirements apply at six USGS gaging stations. The instream flow requirements are applicable at all times.
3. The level of flow (i.e., Subsistence, Dry, Average, or Wet) is determined seasonally based on hydrologic condition.
4. Permittee shall meet a seasonal schedule of individual high flow pulses. The magnitude, duration, timing and frequency and measurement location for the pulses are included as special conditions in Resource Protection Staff's memo (Additional discussion of how these high flow pulses were included in the availability analysis is included in Section C.2 (*Unappropriated Water*) of this memo).
5. In addition to the above requirements, Permittee is prohibited from diverting and

storing water authorized by this permit unless streamflow meets or exceeds the 7Q2 value at additional gages located below Permittee's reservoirs as specified in Resource Protection Staff's memo.

### A.    *Interbasin Transfer and Bed and Banks*

Pursuant to TWC §11.085(v)(3) and (v)(4), the request for an exempt interbasin transfer does not require a water availability analysis. For the request to use the bed and banks of the Brazos River and its tributaries, the application indicates that although specific locations, quantities and diversion rates for the bed and banks request are unknown at this time, potential diversion locations include the perimeter of all existing and proposed BRA reservoirs. The application also indicates that potential diversion locations include the following stream reaches:

- Brazos River from the confluence of the Salt and Double Mountain Forks to the Gulf of Mexico,
- Double Mountain Fork of the Brazos River below Lake Alan Henry to its confluence with the Brazos River,
- Leon River from Lake Proctor to the confluence with the Little River,
- Lampasas River from Lake Stillhouse Hollow to the confluence with the Little River,
- Little River from the junction of Leon and Lampasas Rivers to the confluence with the Brazos River,
- Yegua Creek from Lake Somerville to the confluence with the Brazos River,
- Navasota River from Lake Limestone to the confluence with the Brazos River,
- Allens Creek from below Allens Creek Reservoir to confluence with the Brazos River,
- Any other tributary of the Brazos River into which water appropriated under this application (groundwater or surface water under the control of BRA) is discharged.

With the exception of Permit 2925 (Allens Creek Reservoir), BRA's current rights authorize use of the bed and banks of the Brazos River and its tributaries below the Authority's reservoirs to deliver water to downstream customers. The application indicates that the location of specific amounts, rates, releases and loss information will be detailed in BRA's Management Plan once the specific amount of unappropriated water and return flows available to BRA is determined. Staff is of the opinion that accounting for the bed and banks transfer of water through a delivery plan will mitigate any effects on basin water rights. The accounting/delivery plan should be included in BRA's Water Management Plan (WMP).

### B.    *Return Flows*

The application requests appropriation of current and future return flows in the Brazos Basin discharged from 136 locations by various entities. These discharges include surface and groundwater based return flows. The surface water based return flow includes discharges from BRA facilities, discharges of water originating from BRA's water rights, as well as discharges from facilities owned by other entities and originating from non-BRA sources of supply.

A review of water rights in the Brazos River Basin indicates that Permit 4218 (diversion of 172 acre-feet of water from South Nolan Creek); Permit 5088 (diversion of 37 acre-feet of water from South Nolan Creek); and Permit 5089 (diversion of 60 acre-feet of water from South Nolan Creek) were explicitly granted based on the presence of return flows now being claimed as part of this application. Staff

recognizes the possibility that other basin rights were granted based on the presence of the requested return flows. Because of this, a priority date of October 15, 2004 is assigned to the applicant's diversions of historically discharged return flows. To evaluate the request for reuse of return flows, staff identified those return flows discharged from BRA facilities, or originating from diversions authorized by BRA's existing water rights, that have not been previously appropriated by other water rights as indicated in Table 1. below. BRA also requested reuse of return flows generated by four power plants that receive contract water from BRA's water rights. These return flows result from once through cooling water, or other power plant operations, and are thus highly variable. The application did not provide sufficient information to evaluate this request and these return flows were not included in the analysis.

The Current Conditions data set was updated with the amount of current return flows as indicated in the application (74,387 acre-feet which is the sum of the maximum reported annual discharge amounts for each plant). The request to reuse return flows was modeled at the most downstream point in the basin to determine the volume of return flows available to BRA on a basin-wide basis. Results indicate that 100% and 75% of the return flows were available in 45% and 81% of the years in the period of record, respectively and the monthly amount of discharged return flows was available in 87% of the months.

Table 1. Return Flows Available to BRA

| Name | TPDES Permit Number | Permitted Discharge (mgd) | Current BRA Source | Percent of SW from BRA | Current Surface Water Returns (ac-ft/yr) | Current Ground-water Returns (ac-ft/yr) |
|---|---|---|---|---|---|---|
| Sportsmans World MUD WTP | 02461000 | 0.01 | Possum Kingdom | 100% | 11.2 | 0 |
| Double Diamond | 02789000 | 0.06 | Possum Kingdom | 100% | 67 | 0 |
| Authority SWATS | 02889000 | 2.5 | Granbury System | 100% | 730 | 0 |
| City of Copperas Cove | 10045003 | 2.5 | Lake Belton | 100% | 923 | 0 |
| City of Copperas Cove | 10045004 | 2.5 | Lake Belton | 100% | 1.375 | 0 |
| City of Copperas Cove | 10045005 | 4.0 | Lake Belton | 100% | 1.600 | 0 |
| City of DeLeon | 10078001 | 0.3 | Lake Proctor | 100% | 192 | 0 |
| City of Marlin | 10110002 | 2.0 | Whitney System | 16% | 159.4 | 0 |
| City of Harker Heights | 10155001 | 3.0 | Lake Belton | 100% | 2.780 | 0 |
| City of Gatesville | 10176002 | 2.2 | Lake Belton | 100% | 1.731 | 0 |
| City of Gatesville | 10176004 | 1.0 | Lake Belton | 100% | 703 | 0 |
| City of Granbury | 10178002 | 2.0 | Granbury System | 100% | 1313 | 0 |

| Name | TPDES Permit Number | Permitted Discharge (mgd) | Current BRA Source | Percent of SW from BRA | Current Surface Water Returns (ac-ft/yr) | Current Ground-water Returns (ac-ft/yr) |
|---|---|---|---|---|---|---|
| City of Lampasas | 10205002 | 1.5 | Lake Stillhouse Hollow | 100% | 580 | 0 |
| City of McGregor (South WWTP) | 10219002 | 0.99 | Lake Belton | 95% | 651.7 | 0 |
| City of Moody | 10225001 | 0.2 | Lake Belton | 100% | 157 | 0 |
| Authority/LCRA BCRWSS West | 10264001 | 3.0 | Georgetown/Still-house System | 100% | 2,402 | 1,657 |
| Authority/LCRA BCRWSS East | 10264002 | 21.5 | Georgetown/Still-house System | 100% | 16.767 | 0 |
| City of Taylor | 10299001 | 4.0 | Granger System | 100% | 2.220 | 0 |
| Bell County WCID#1 | 10351001 | 0.9 | Lake Belton | 100% | 983 | 0 |
| Bell County WCID#1 | 10351002 | 18.0 | Lake Belton | 100% | 14.123 | 0 |
| Bell County WCID#1 | 10351003 | 6.0 | Lake Belton | 100% | 5,389 | 0 |
| City of Brenham | 10388001 | 3.55 | Lake Somerville | 100% | 2,485 | 0 |
| City of Dublin | 10405001 | 0.45 | Lake Proctor | 100% | 325 | 0 |
| City of Georgetown | 10489002 | 2.5 | Georgetown/Still-house System | 100% | 1,815 | 0 |
| City of Georgetown | 10489003 | 2.5 | Georgetown/Still-house System | 100% | 1,423 | 0 |
| City of Georgetown | 10489005 | 1.5 | Georgetown/Still-house System | 100% | 1.389 | 0 |
| City of Hamilton | 10492002 | 0.44 | Lake Proctor | 100% | 392 | 0 |
| City of Hillsboro | 10630001 | 1.81 | Lake Aquilla | 100% | 1,440 | 0 |
| City of Rosebud | 10731001 | 0.25 | Lake Stillhouse Hollow | 100% | 194 | 0 |
| Bell County WCID#3 | 10797001 | 0.675 | Lake Belton | 100% | 360 | 0 |
| City of Holland | 10897001 | 0.2 | Lake Stillhouse Hollow | 100% | 93 | 0 |
| Bell County WCID#2 | 11090001 | 0.094 | Lake Belton | 100% | 63 | 0 |
| Bell County WCID#2 | 11091001 | 0.08 | Lake Belton | 100% | 70 | 0 |
| Authority TBRSS | 11318001 | 10.0 | Lake Belton | 100% | 8.523 | 0 |

| Name | TPDES Permit Number | Permitted Discharge (mgd) | Current BRA Source | Percent of SW from BRA | Current Surface Water Returns (ac-ft/yr) | Current Ground-water Returns (ac-ft/yr) |
|------|---------------------|---------------------------|--------------------|------------------------|------------------------------------------|------------------------------------------|
| Acton MUD | 14211001 | 0.6 | Granbury System | 100% | 366 | 0 |
| Acton MUD | 14212001 | 0.49 | Granbury System | 100% | 268 | 0 |
| City of Comanche | 14445001 | 0.6 | Lake Proctor | 100% | 324 | 0 |

C.    *Unappropriated Water*

The request for unappropriated water was incorporated into the TCEQ WAM as follows:

1) The Dual Simulation[1] approach was used. For each existing BRA authorization:
   a) Water rights activated only in the initial simulation represent existing diversions and storage authorized by the BRA's senior rights. These water rights calculate the total depletions and storage.
   b) Water rights activated during the second simulation calculate the depletion for the senior rights limited by the streamflow depletion in the preceding step.
   c) The final depletions are stored at a virtual control point until the priority date of the System Operation Permit application (October 15, 2004), and
   d) BRA's reservoirs are refilled using a priority date of October 15, 2004, with the stored final depletions. Any remaining water is returned to the stream at the control points of the BRA's existing water rights.

2) TCEQ Resource Protection Staff recommendations for instream flow protection were incorporated into the Brazos WAM at the priority date of the application as follows:
   a) Seasonal flow requirements were converted to monthly values in acre-feet.
   b) The instream flow requirements were subtracted from the seasonal pulse values to determine the incremental HFP (high flow pulse).
   c) The incremental HFP was multiplied by the seasonal pulse frequency to determine the total pulse volume for each season.
   d) The total pulse volume for each season was distributed by month
   e) The monthly pulse volume was added to the monthly instream flow volume for each flow regime to determine the WAM instream flow constraint for each month for each flow regime. and
   f) 7Q2 flows for the additional control points were converted to an annual value in acre-feet and added to the model.
   g) Based on a distribution of the annual diversion amount to a monthly value in WAM and conversion of that value to a daily diversion in cfs, staff determined that the diversion rate for BRA's diversions would be below 7,535 cfs at USGS Gage 08114000. Brazos River near Richmond.

3) After applying the instream flow constraints. the new appropriation of water was then included in the

---

[1] For additional explanation of Dual Simulation. see Wurbs. Ralph A. 2007 *Water Rights Analysis Package (WRAP) Modeling System Users Manual* TR-256. Texas Water Resources Institute. College Station. Texas. Pp. 94-96.

second simulation (which generated the final results) as follows:

a) All BRA reservoirs are refilled with any unappropriated water at the priority date of this application.

b) Diversions are made, backed up by system storage in all BRA reservoirs, and

c) All BRA reservoirs are then refilled again to ensure that all water potentially available under the permit application is impounded.

To determine the amount of water available for appropriation, Staff first evaluated the applicant's request for firm water, i.e., that amount of water that would be available 100% of the time during the period of record. The request for firm water was modeled using the TCEQ Full Authorization simulation, which does not include return flows. Staff evaluated the requests for firm yield water at the three points requested in the application; from upstream to downstream being Glen Rose, Highbank and the Gulf of Mexico. The most downstream point for measurement of instream flow requirements is the Richmond gage. Staff calculated the amount of flow available to BRA at the Gulf of Mexico by determining the amount of flow available at the Richmond gage and applying a drainage area ratio relationship between the Richmond gage and the WAM control point representing the basin outlet at the Gulf of Mexico.

The analysis was conducted for two scenarios. The first simulation included Allens Creek Reservoir at its fully authorized amounts for storage and diversion, and was used to determine the amount of water available for appropriation after considering all water rights at their fully authorized amounts. The second simulation was conducted to determine if the water appropriated for Allens Creek Reservoir could be used more efficiently by the BRA, in conjunction with other water rights requested by this application, until such time as Allens Creek Reservoir is constructed. The amount of firm water available to BRA is indicated in Table 2. below. To the extent that removal of the requirement for wet season pulses at Richmond resulted in additional unappropriated water, staff recommended the additional amount.

The application requested an amount of additional water that would be available on a reasonably dependable basis. The application states that this water would be available if 90,000 acre-feet of firm water was used, along with other sources available to the applicant, to produce the additional supply. Pursuant to 30TAC §297.42(d), Staff may recommend granting applications that are not based upon the continuous availability of historic, normal stream flow on a case-by-case basis. A system operation in conjunction with other water rights is an application that may not be required to be based on the continuous availability of historic, normal streamflow. The applicant has requested that the additional amount of water be evaluated using the criteria in 30TAC §297.42(c), that is, 75% of the water is available 75% of the time when distributed on a monthly basis (75/75 criteria). Staff modeled this request using the Full Authorization simulation and included the applicant's estimated current return flows. Model results (Table 3.) indicate that additional amounts of water are available to the applicant using the 75/75 criteria.

Table 2. New Appropriation of Water (includes Allens Creek)

| Location | Volume in acre-feet | |
|---|---|---|
| | Firm | Non-Firm |
| Glen Rose | 131.363 | 157.000 |
| Highbank | 144,306 | 303.000 |
| Richmond | 188.470 | 670.000 |
| Gulf of Mexico | 191.516 | 670.000 |

Table 3. New Appropriation of Water (does not include Allens Creek)

|  | Volume in acre-feet | |
|---|---|---|
| Location | Firm | Non-Firm |
| Glen Rose | 131,363 | 190,000 |
| Highbank | 175,306 | 284,000 |
| Richmond | 237,920 | 869,000 |
| Gulf of Mexico | 241,765 | 869,000 |

**No Injury Review**

The application requests authorization for operational flexibility to use any source of water available to BRA to satisfy the diversion requirements of senior water rights to the same extent that those water rights would have been satisfied by passing inflows through the BRA's reservoirs on a priority basis. The new authorization requested in this permit has a priority date junior to most basin water rights. Although changes in operations for BRA's existing water rights resulting from additional operational flexibility have the potential to affect river flows in the Brazos River and its tributaries, Staff is of the opinion that implementation of accounting measures should mitigate any impacts to senior and superior water rights. These accounting measures should be part of the accounting/delivery plan, which should be included in the WMP.

The application requests authorization to release, pump and transport water from any of the BRA's reservoirs for subsequent storage, diversion and use throughout the BRA's service area. The request to release, pump and transport stored water should have no effect on other basin rights so long as BRA obtains the appropriate bed and banks authorizations as needed. In addition, special conditions requiring BRA to maintain an accounting of water in storage by priority date should mitigate any impacts to downstream senior and superior water rights.

The application requests that the Commission recognize that the System Operation Permit will prevail over inconsistent provisions in the BRA's existing water rights regarding system operation. This would include existing limitations on the percentage of reservoir storage allowed to be used in system operations and identification of sources of supply. Specifically, the existing system operation order requires the BRA to exclude tributary reservoirs from operation of the system during any period of time in which BRA's permitted storage space is less than 30% full. The application states that the Commission's review and approval of the BRA's Management Plan will provide equivalent safeguards and, at the same time, allow the BRA greater operational flexibility. Staff agrees that there may be inconsistent provisions and recommends special conditions to clarify inconsistencies while protecting other basin water rights.

**Conclusion**

Based on the review and analysis of this application, staff can support granting the application provided the permit contains the special conditions proposed by Resource Protection staff and additional special conditions as indicated below.

*A. Interbasin Transfer and Bed and Banks*

The water requested for exempt interbasin transfer will be authorized with a priority date of October 15, 2004 and as such will be among the most junior rights in the Brazos River Basin. Therefore, there can be

no effects on existing water rights and staff can recommend granting this request.

Staff can recommend authorization for the use of the bed and banks of streams already authorized in BRA's current permits, certificates and amendments, subject to identification of specific losses. Staff recommends that the permit contain the following special conditions:

1. The use of the bed and banks of Allens Creek from below Allens Creek Reservoir to the Brazos River is not authorized until Permittee applies for and is granted an amendment to Permit 2925A.

2. Permittee is authorized to use the following reaches, authorized in Permittee's certificates and amendments, for conveyance of water, previously appropriated to the Permittee and water authorized by this permit, downstream for diversion at Glen Rose, Highbank and the Gulf of Mexico and any of the Permittee's currently authorized diversion points within these reaches:
   A. Brazos River from below Possum Kingdom Reservoir to the Gulf of Mexico
   B. Leon River from Lake Proctor to the confluence with the Little River
   C. Lampasas River from Lake Stillhouse Hollow to the confluence with the Little River
   D. Little River from the junction of Leon and Lampasas Rivers to the confluence with the Brazos River
   E. Yegua Creek from Lake Somerville to the confluence with the Brazos River
   F. Navasota River from Lake Limestone to the confluence with the Brazos River

3. Prior to use of the bed and banks identified in Special Condition A.2. above, Permittee must submit to and have approved by the Executive Director, as part of its accounting/delivery plan, a procedure to estimate daily deliveries of water. This procedure should be in electronic format and detail by source, type and priority date, the amounts to be conveyed and delivered, losses associated with the conveyance, specific points of diversion, associated travel times, and times of commencement and termination of transit for conveyed waters. Documentation of actual deliveries as well as the accounting/delivery plan shall be maintained by the Permittee in electronic format and made available to the general public during normal business hours and to the Executive Director upon request. Modifications or changes to the accounting/delivery plan must be approved by the Executive Director.

4. The use of the bed and banks of additional streams and tributaries in the Brazos River Basin for conveyance of water appropriated under this permit, or other sources available to the Permittee, is subject to Permittee, after identifying specific sources and types of water, specific points of discharge and diversion, and conveyance and other losses, obtaining future authorizations to satisfy the requirements of TWC § 11.042.

5. The use of additional points of diversion within the reaches specified in Special Condition A.2. above is subject to Permittee, obtaining authorization to use those diversion points. The points of diversion may also be identified and included in Permittee's proposed WMP which is subject to Commission approval.

## B. *Reuse of Return Flows*

Staff can recommend granting BRA authorization to reuse return flows discharged from BRA facilities or originating from diversions under BRA's water rights, as indicated in Table 1. above. subject to the following special conditions to protect water rights granted based on the presence of those return flows as

well as other senior water rights:

1. Prior to the diversion of return flows authorized by this permit, Permittee must submit to and have approved by the Executive Director, a reuse accounting plan. The reuse accounting plan must be in electronic format and account, by source, for all return flows discharged and subsequently diverted. The reuse accounting plan should include amounts discharged by outfall, amounts of return flows used by permits granted based on the presence of these return flows, and estimated travel times and conveyance losses from discharge point to diversion point(s). If the return flows will be stored in Permittee's reservoirs, the reuse accounting plan should include any evaporative losses associated with the storage. Permittee shall maintain the approved reuse accounting plan in electronic format and make it available to the general public during normal business hours and to the Executive Director upon request. Modifications or changes to the reuse accounting plan must be approved by the Executive Director. The reuse accounting plan shall be included as part of Permittee's accounting/delivery plan.

2. The right to divert discharged return flows from plants owned by the City of Granbury (TPDES Permit No. 10178002), Acton MUD (TPDES Permit Nos. 14211001 and 14212001), Bell County WCID #2 (TPDES Permit No. 11090001), City of Georgetown (TPDES Permit Nos. 10489002 and 10489003) and the City of Holland (TPDES Permit No. 10897001) is limited to the amount of surface water based return flows discharged from those plants that originates from water rights owned by the Permittee. Permittee is not authorized to divert groundwater based return flows discharged from these plants, except as may be authorized by Special Condition B.4.. Permittee must include in the reuse accounting plan the total amount discharged from the plants and the percentage of that water that is divertable under this permit.

3. Permittee is authorized to divert historically discharged groundwater based return flows from the Brazos River Authority/LCRA BCRWSS West (TPDES Permit No. 10264001).

4. Future discharges of groundwater based return flows may be diverted if those return flows originate from groundwater owned by Permittee or are discharged from treatment plants owned by the Permittee. Prior to diversion, Permittee must apply for and be granted an amendment to this permit authorizing these diversions and shall submit for approval by the Executive Director, a revised accounting/delivery plan addressing such new groundwater based discharges.

5. Permittee is authorized to divert only that water discharged by the City of Marlin (TPDES Permit No. 10110002) originating from water rights owned by the Permittee. Permittee shall calculate the divertable amount of the City's discharge and include this information in the reuse accounting plan.

6. Permittee shall only divert the actual annual amount of return flows discharged from the Bell County WCID #1 (TPDES Permit Nos. 10351001 and 10351002) and the City of Harker Heights (TPDES Permit No. 10155001) less up to 172 acre-feet as authorized by Permit 4218. 37 acre-feet as authorized by Permit 5088 and 60 acre-feet as authorized by Permit 5089 when the aforementioned permits are being used.

7. Diversions and storage of return flows shall not occur at rates or in amounts higher than the actual daily amount of return flows discharged into watercourses in the Brazos River Basin. after accounting for the calculated losses and travel time from the discharge point(s) to the diversion point(s) in accordance with the accounting/delivery plan.

8. Prior to diversion of the water authorized herein, if sufficiently accurate measuring devices are not available, Permittee shall install and maintain measuring device(s) capable of measuring within plus or minus 5% accuracy, at the discharge point of each wastewater treatment plant (WWTP) to record the amount of return flows discharged into the Brazos River or its tributaries on a daily basis.

9. The priority date for diversion of up to 116,434 acre-feet (103.899 mgd) of return flows is October 15, 2004.

10. The priority date for diversion of future return flows in excess of 116,434 acre-feet (103.899 mgd) of discharged return flows is October 15, 2004 but is not subject to call by senior and superior permit holders in the basin and is not subject to instream flow limitations.

11. Prior to diversion of any return flows in excess of the individual TPDES Permit limits indicated in the Table 1. Return Flows Available to BRA, Permittee must apply for and be granted the right to reuse those return flows. Permittee must amend the reuse accounting plan to include future return flows prior to diverting said return flows.

12. The diversion of up to 116,434 acre-feet (103.899 mgd) of water is dependant upon potentially interruptible return flows or discharges and is conditioned on the availability of those discharges. The right to divert the discharged return flows is subject to revocation if discharges become permanently unavailable for diversion and may be subject to reduction if the return flows are not available in quantities and qualities sufficient to satisfy the permit. Should any of the discharges become permanently unavailable for diversion, Permittee shall immediately cease diversion of those return flows and reflect such reductions in the reuse accounting plan.

13. Permittee's diversion and use of return flows is subject to interruption by direct use or indirect use within the discharging entity's corporate limits, extraterritorial jurisdiction, or contiguous water certificate of convenience and necessity boundary, provided the discharging entity has applied for and been granted authorization to reuse the return flows.

## C. *Unappropriated Water*

Staff can recommend granting reduced amounts of unappropriated water as follows:

Table 4. New Appropriation of Water

| Location | Volume in acre-feet | |
| --- | --- | --- |
| | Firm Water | Non-Firm Water |
| Glen Rose | 131,363 | 157,000 |
| Highbank | 144,306 | 303,000 |
| Richmond | 188,470 | 670,000 |
| Gulf of Mexico | 191,516 | 670,000 |

### Table 5. New Appropriation of Water (does not include Allens Creek)

| Location | Volume in acre-feet | |
|---|---|---|
| | Firm | Non-Firm |
| Glen Rose | 131.363 | 190,000 |
| Highbank | 175,306 | 284,000 |
| Richmond | 237,920 | 869,000 |
| Gulf of Mexico | 241,765 | 869,000 |

In order to ensure that existing basin rights are protected, the following special conditions should be included in the permit:

1. Prior to diversion or storage of the additional water authorized by this permit, Permittee shall provide to and have approved by the Executive Director, a daily accounting/delivery plan that includes, at minimum, the following:

    a. The accounting/delivery plan shall address reservoir storage and withdrawal plans for each system reservoir and account by priority date and amounts for any inflows, evaporation, water in storage and diversions from the reservoirs under all of Permittee's priority dates and authorizations including reuse.

    b. A method to account for inflows to system reservoirs for purposes of compliance with special conditions requiring passage of pulse flows and estimation of those inflows.

    c. An accounting of instream flow and pulse requirements to include total system storage, gage flows at the measurement points, high flow pulse volume impounded and the release schedule for the impounded high flow pulse, and timing, magnitude and duration of pulse flows.

    d. The accounting/delivery plan must detail how measurements will be taken to determine if impoundment or diversions under either Permittee's senior or junior rights can be made.

    e. The accounting/delivery plan must identify, account for, and distinguish between firm and non-firm water supplied or delivered from Permittee's system of reservoirs. In addition, the accounting/delivery plan must specify diversion points for this water if those diversion points are not specifically identified in this permit. Any additional diversion points must be within the reaches where use of the bed and banks is authorized. Any diversion points outside those reaches will require an amendment to this permit.

    f. Permittee shall maintain the approved daily accounting/delivery plan in electronic format and make it available to the general public during normal business hours and to the Executive Director upon request. Modifications or changes to the plan must be approved by the Executive Director.

2. If the total amounts of firm water indicated above are diverted at Glen Rose or Highbank. the additional amount of firm water available below those points is reduced accordingly. Permittee shall include the amount of that reduction in the accounting/delivery plan.

3. The full additional amount of non-firm water is only available when the amount of firm water is reduced by 90.000 acre-feet at Glen Rose, Highbank and the Gulf of Mexico. If less than the full amount of non-firm water is used, the amount of the firm water reduction shall be adjusted proportionately.

4. The non-firm water authorized above includes 74.387 acre-feet of historically discharged return flows. A reduction in firm yield water is not required in order to divert these return flows

5. The remaining 42,047 acre-feet of return flows out of the total amount of 116,434 acre-feet of return flows (Table 1.) may be diverted by the Permittee so long as the total diversions under this permit for all of the authorizations do not exceed the amounts of firm water and non-firm water indicated in Tables 4. and 5., above unless Permittee applies for and is granted the authorization to divert additional amounts of water.

6. Permittee may not exercise a priority call on water rights in the Brazos River Basin with priority dates senior to October 15, 2004 for purposes of increasing storage in and/or diversion from Permittee's system reservoirs where drawdown of Permittee's system reservoirs is caused by compliance with the terms and conditions of this permit.

7. The request for operational flexibility to use any source of water available to Permittee to satisfy the diversion requirements of senior water rights to the same extent that those water rights would have been satisfied by passing inflows through the Permittee's system reservoirs on a priority basis is limited as follows:
   a. To water previously stored in Permittee's reservoirs as documented in the accounting/delivery plan required in Special Condition C.1. above.
   b. Use of this option shall not cause Permittee to be out of compliance with Special Condition C.1. and Special Condition C.6.

8. Permittee may divert water from storage in its permitted reservoirs and store that water in Permittee's other reservoirs for use within the Permittee's service area so long as all diversions and storage are included in and comply with the provisions of the accounting/delivery plan and Special Condition C.1. above.

9. The total amount of water diverted and released from Permittee's system reservoirs in any year for each authorized purpose of use may not exceed the cumulative authorized total for each purpose until Permittee applies for and is granted amendments to the underlying authorizations.

10. Permittee is required to comply with the existing System Operation Order and certificates of adjudication requiring Permittee to exclude tributary reservoirs from operation of the system during any period of time in which Permittee's permitted storage space in that reservoir is less than 30% full (until all system reservoirs are below 30% capacity, at which time the reservoir can resume system operation), until such time as Permittee submits, and the Commission approves, a WMP for the Brazos River Basin which details how such limitations will be altered. Any alterations to the limitations must be in compliance with the accounting provisions required in Special Condition C.1 above.

11. Until such time as the ports are closed on the dam impounding Allens Creek Reservoir, authorized by Permit 2925, Permittee may impound and divert additional unappropriated water as specified in Table 5. subject to Special Conditions C.1. through C.10. above.

12. Permittee shall prepare and submit to the Commission, a Water Management Plan (WMP) which shall include such studies and other information as may be required by the Commission to demonstrate Permittee's compliance with and its ability to comply with all of the Special Conditions included in this permit.

13. The initial proceedings to consider the adoption of the WMP, and any major amendment thereof, shall be pursuant to contested case procedures. Any proceeding to consider the adoption or major amendment of the WMP shall be preceded by notice and opportunity to request a hearing, in accordance with the Commission's regulations applicable to water rights permitting proceedings. The WMP shall provide an adaptive management strategy for water supply and thus may be amended from time to time upon the request of Permittee or on the Commission's own motion. The initial accounting/delivery plan shall be submitted as part of the WMP.

Kathy Alexander/Hydrologist

TO:       , Office of the Chief Clerk       DATE: March 20, 2006
Texas Commission on Environmental Quality

THRU:     Kellye Rila     ILR
Team Leader

FROM:     Kathy C. Hopkins, Project Manager
Water Rights Permitting Team

SUBJECT:  Bradley B. Ware
CN601474224, RN102842416
Application No. 5594A to Amend Water Use Permit No. 5594
TWC §11.122, Requiring Mailed and Published Notice
Lampasas River, Brazos River Basin
Bell County

The application was received on November 17, 2005. Additional information and fees were received on February 8, 2006. The application was declared administratively complete and accepted for filing on March 20, 2006. Notice is being published and mailed pursuant to TAC §295.158 to the water rights holders of record in the Brazos River Basin.

Bradley B. Ware has applied for an amendment to its existing Water Use Permit on the Lampasas River, Brazos River Basin, in Bell County to extend or delete the expiration date of November 7, 2007, add an additional 31 acres for irrigation, and to divert and use an additional 20 acre-feet of water.

Fees have been paid and the application is sufficient for filing.

Kathy C. Hopkins
Water Rights Permitting Team

EXHIBIT
C